UNITED STATES, Appellee,

v.

Michael G. McDONAGH, Specialist Four,
U.S. Army, Appellant.

No. 40,609.

CM 439377.

U. S. Court of Military Appeals.

Jan. 17, 1983.

For Appellee: *Colonel R.R. Boller, Major Ted B. Borek, Captain Kenneth H. Clevenger* (on brief); *Major Douglas P. Franklin.*

For Appellant: *Colonel Edward S. Adamkewicz, Jr., Major Charles A. Byler, Captain Edward J. Walinsky* (on brief); *Captain Edward J. Walinsky.*

*Opinion*

EVERETT, Chief Judge:

At his trial by general court-martial for various offenses involving the sale and transfer of cocaine, in violation of Articles 81 and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 881 and 934, respectively, appellant contested the court's *in personam* jurisdiction. He claimed that he was not subject to the Code because his enlistment was void, having been accomplished with the fraudulent assistance of the recruiter. *Cf. United States v. Russo,* 1 M.J. 134 (C.M.A.1975).

After trial commenced, Congress passed legislation amending [1] Article 2 of the Uniform Code, 10 U.S.C. § 802, which designates the classes of persons subject to the Code. Relying on this amendment, which became effective on November 9, 1979, the military judge ruled that the court-martial had jurisdiction over McDonagh. Thereafter appellant pleaded guilty, was convicted, and received a sentence which, as modified and approved by the convening authority, includes dishonorable discharge, confinement at hard labor for 30 months, total forfeitures, and reduction to the lowest enlisted grade. The United States Army Court of Military Review affirmed the findings of guilty and the sentence as approved, 10 M.J. 698 (C.M.R.1981). We granted appellant's petition to review the retroactive effect of the amendment to Article 2. 11 M.J. 284 (C.M.A.1981).

I

On January 5, 1976, appellant enlisted in the Army Reserve with a commitment to enlist in the Regular Army; on January 21, 1976, he enlisted in the Regular Army for four years. He testified that during the month before his enlistment he had been smoking marihuana regularly and had felt a "mental dependency" on this drug. Also, he had been using amphetamines and barbiturates. According to him, he had informed the recruiter "[t]hat I did drugs, and I specified what types; and that I sold drugs to make money to buy drugs for myself." Also, he had given an affirmative answer to a question on his application for

enlistment concerning his involvement with drugs, but he had not provided any explanation for that answer as required by the application.

At trial counsel's request the military judge granted a continuance from September 25, 1979, until November 5, 1979, to permit investigation of appellant's claims. In fact, the court did not reconvene until December 5, when it met to consider the impact of the amendments to Article 2 which had taken effect on November 9, 1979. After briefs had been filed and oral argument had taken place, the following occurred [2]:

> The military judge concluded that the defense evidence raised a question of nonwaivable disqualification for enlistment by reason of habitual use of marihuana, made known to the recruiter and willfully concealed by him, and concluded that, if true, this would bring the case squarely within the *Russo* doctrine. However, he then ruled that, there being no question as to the appellant's capacity to contract or as to the voluntariness of his enlistment, the new Article 2(b) of the Uniform Code effectively overruled *Russo* so that he need no longer follow it. Pleas were entered and the trial proceeded to the conclusion previously mentioned.

II

Appellant argues that, under the law of this Court, *see United States v. Russo, supra,* he was not a member of the military at the time either of his alleged offenses or of

---

1. Act of November 9, 1979, Pub.L.No. 96–107, § 801, 93 Stat. 810, in part pertinent to this appeal, added the following language to the end of Article 2 of the Uniform Code of Military Justice, 10 U.S.C. 802:

   (b) The voluntary enlistment of any person who has the capacity to understand the significance of enlisting in the armed forces shall be valid for purposes of jurisdiction under subsection (a) of this section and a change of status from civilian to member of the armed forces shall be effective upon the taking of the oath of enlistment.

   (c) Notwithstanding any other provision of law, a person serving with an armed force who—

(1) submitted voluntarily to military authority;

(2) met the mental competency and minimum age qualifications of sections 504 and 505 of this title at the time of voluntary submission to military authority;

(3) received military pay or allowances; and

(4) performed military duties;

is subject to this chapter until such person's active service has been terminated in accordance with law or regulations promulgated by the Secretary concerned.

2. *United States v. McDonagh,* 10 M.J. 698, 702 (A.C.M.R.1981).

his trial, because recruiter misconduct vitiated his enlistment and therefore *in personam* military jurisdiction had never attached when he made his motion to dismiss for lack of jurisdiction. Finally, he contends—with the support of Senior Judge Fulton in the court below—that by applying the Article 2 amendment in this case, the trial judge gave that legislation an *ex post facto* effect.

## A

In determining the effects of the 1979 amendment, we initially must inquire into congressional intent. There are several possible interpretations. The most restrictive is that the amendment was intended to apply only to persons who enlisted after its effective date. This interpretation may be supportable as to the scope of section 802(b), which was designed to correct the absence of military jurisdiction resulting from recruiter misconduct in procuring enlistment[3]; but it would not fit with section 802(c), which incorporates the constructive-enlistment concept. The premise for holding that a person's status has been changed by a constructive enlistment is that, despite defects in any purported formal enlistment, one who submits to military authority and receives the benefits and performs the duties of a servicemember should be treated as being in the service for purposes of military jurisdiction. Accordingly, there would be no occasion for Congress to intend that section 802(c) not apply to anyone who, after November 9, 1979, submitted himself to military control, received military pay and allowances, and performed military duties, even though his purported former enlistment may have preceded that date.

A second possible interpretation is that the 1979 amendment applies only to persons tried for offenses committed after November 9, 1979. Unlike those interpretations which would give a broader scope to the Article 2 amendment, this construction rais-

es no *ex post facto* issue and therefore is supported by the canon that, when ambiguous, statutes should be construed to avoid creating constitutional problems. *Cf.* 2A Sutherland, *Statutes and Statutory Construction* § 45.11 (4th ed. 1973).

Another interpretation is that the amendments apply to any trial commenced after November 9, 1979, even though the alleged offenses were committed prior to that date.

The final possibility is to apply the Article 2 amendment not only to offenses committed after November 9, 1979, and to trials begun after that date, but also to any cases pending on appeal at that time, whatever the dates of the offenses or the trials. Unless this sweeping interpretation is adopted, the 1979 amendment to Article 2 of the Code has no bearing on the present case.

The *ex post facto* problem created by this interpretation argues against accepting it. On the other hand, if we construe the amendments as applicable to any case for which appellate review is not yet completed, we conform to the general rule that an appellate court applies "the law in effect at the time it renders its decision." *Bradley v. School Board of City of Richmond,* 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476, 488 (1974); *cf. Thorpe v. Housing Authority of City of Durham,* 393 U.S. 268, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969). Moreover, since the amendments to Article 2 were designed to remedy difficulties which several witnesses at the congressional hearings attributed to judicial misinterpretations of well-established law, giving the amendments the widest possible scope also would comply with the principle that remedial statutes are to be construed liberally.[4]

Nothing in the 1979 legislation states explicitly how it is to be applied, insofar as retroactivity is concerned. Hearings on this amendment were conducted only in the

---

**3.** In *United States v. Clardy,* 13 M.J. 308 (C.M.A.1982), where we held that a discharge for purposes of immediate reenlistment does not terminate military jurisdiction, we applied the decision only prospectively to reenlistments that postdated our mandate in that case.

**4.** 3 Sutherland, *Statutes and Statutory Construction* § 60.01 (4th ed. 1974). On the other hand, the canon that penal statutes ought to be construed strictly might suggest a narrow interpretation of the scope of the amendments. *Id.* at § 59.03.

House of Representatives and in the record of those hearings we have located only three specific references to retroactivity. The first was in this colloquy between William H. Hogan, Jr., General Counsel to the House Armed Services Committee, and Deanne Siemer, General Counsel of the Department of Defense, who was testifying in support of the Article 2 amendment:[5]

> Mr. Hogan. Now, I am troubled a little bit, which I expressed earlier to some of the staff members, about the effective date, the effectiveness of this article 2 legislation. Do we have any retroactivity? Who is in and who is out?
>
> Ms. Siemer. Counsel, it is our view that the amendments apply to all individuals who are on active duty on the date of the enactment or in the future. They apply to all offenses whenever they are committed consistent with the double jeopardy provisions of the Uniform Code.
>
> We find no effective date problem and no need for a separate effective date provision. The amendments will become effective when they are enacted. Because neither one of these amendments expands the current statutory authority, we find no problem of possibly reaching back to past offenses.

The position taken by Ms. Siemer as to retroactivity was consistent with the premise on which all the Department of Defense witnesses apparently relied—namely, that the amendment to Article 2 simply reaffirmed a preexisting congressional intent that had been misinterpreted by our Court. Thus, according to Admiral Charles E. McDowell, The Judge Advocate General of the Navy, the amendment[6]

> does not create new law or set new standards for determining the validity of an enlistment for UCMJ jurisdiction purposes, for it merely codifies the 1890 Supreme Court case of *In Re Grimley* [137 U.S. 147, 11 S.Ct. 54, 34 L.Ed. 636], and

reaffirms congressional intent in this area.

A second discussion of retroactivity, also initiated by Mr. Hogan, was to this effect:[7]

> Mr. Hogan: One point I want to go over just briefly, and that is the question of the effective date, the effectiveness of the article 2 amendment, retroactivity. Would one of you comment on that?
>
> General Persons. Well, it is the position of the Defense Department that it becomes effective on the date it is enacted by reason of the language in the basic bill, that it will apply to all persons in the Armed Forces on the effective date of enactment and, therefore, will apply to offenses that were committed by any of those people even though they happen to have been before the effective date of enactment.
>
> That is the Defense Department's position on the bill, and it is because of the fact that it is not really changing the law, it is simply making clear what the law is and always has been on jurisdiction over people who enter the Armed Forces.

In his prepared statement at the Hearings, Admiral McDowell made this oblique reference to prospectivity:[8]

> If, however, for some reason, it is determined that the proposed new subsection (b) has only prospective application, it will nevertheless accomplish its major goal of statutorily defining what constitutes a valid initial enlistment for UCMJ jurisdiction purposes. Furthermore, if the proposed new subsection (b) is held to be prospective only, then the proposed new subsection (c) will resolve the immediate problem, as it will be applicable to all members of the armed forces currently on active duty, who meet its four-part test, which should occur on the first pay day after enactment of this legislation.

While the committee reports on the legislation are silent as to retroactivity, the Sen-

---

5. Hearings Before the Military Personnel Subcommittee of the House Committee on Armed Services, 96th Cong., 1st Sess., pp. 13–14 (1979).

6. *Id.* at p. 24.

7. *Id.* at p. 52.

8. *Id.* at p. 27.

ate Report does reflect that the amendment's purpose is to overrule

that portion of *United States v. Russo* [1 M.J. 134 (C.M.A.1975)] which invalidated for jurisdictional purposes an otherwise valid enlistment because of recruiter misconduct in the enlistment process. It does so by reaffirming the law as set forth by the Supreme Court in *In Re Grimley,* 137 U.S. 147 [, 11 S.Ct. 54, 34 L.Ed. 636] (1890), and requiring compliance with only two factors before an enlistment will be considered valid: capacity to understand the significance of enlistment in the armed forces and the voluntary taking of the oath of enlistment.

Senate Report No. 96–197, 96th Cong., 1st Sess., 122 (1979), *reprinted in* [1979] U.S. Code Cong. & Ad.News 1818, 1827.

██ Since Congress apparently proceeded on the assumption that it was only correcting aberrant judicial interpretations of legislative intent it had entertained all along, and since, without dissent or opposition,[9] the proponents of the amendment expressed in the hearings their view that the amendment was to be fully retroactive, we conclude that Congress intended the amendment to Article 2 to apply to all pending cases and to be as fully retroactive as would be constitutionally permissible.

### B

Of course, as a result of our interpretation, we must next determine to what extent the United States Constitution limits retroactive application of the amendment to Article 2. Obviously, the draftsmen of the Constitution wished to prevent the unfairness that results when citizens are punished for acts that were lawful at the time they occurred. Therefore, after enumerating congressional powers in Art. I, § 8, they

directed in § 9 that "[n]o Bill of Attainder or *ex post facto* Law shall be passed." Furthermore, in Article I, § 10, the States also were prohibited from passing "any . . . *ex post facto* Law."

██ Not only is the retroactive application of a criminal statute prohibited, but also the retroactive application of a judicial interpretation of a statute may be constitutionally prohibited. Thus, in reversing a South Carolina state court conviction which arose out of a "sit-in" demonstration, the Supreme Court concluded in *Bouie v. City of Columbia,* 378 U.S. 347, 352, 84 S.Ct. 1697, 1702, 12 L.Ed.2d 894 (1964), that the defendant's due-process right to a fair warning of what conduct would be illegal had been abridged by "an unforeseeable and retroactive judicial expansion of narrow and precise statutory language." The Court explained: [10]

Indeed, an unforeseeable judicial enlargement of a criminal statute, applied retroactively, operates precisely like an *ex post facto* law, such as Art. I, § 10, of the Constitution forbids. An *ex post facto* law has been defined by this Court as one "that makes an action done before the passing of the law, and which was *innocent* when done, criminal; and punishes such action," or "that *aggravates a crime,* or makes it *greater* than it was, when committed." *Calder v. Bull,* 3 Dall. 386, 390, 1 L.Ed. 648, 650. If a state legislature is barred by the *Ex Post Facto* Clause from passing such a law, it must follow that a State Supreme Court is barred by the Due Process Clause from achieving precisely the same result by judicial construction. Cf. *Smith v. Cahoon,* 283 U.S. 553, 565, 75 L.Ed. 1264, 1273, 51 S.Ct. 582 [, 586]. The fundamental principle that "the required criminal

---

**9.** Admiral McDowell's comment (n. 8, *supra*) can hardly be construed as evidencing disagreement with the view voiced by Ms. Siemer and General Persons.

**10.** In reversing an earlier interpretation that embezzled funds were not included in the "gross income" of the embezzler, the plurality opinion in the Supreme Court stated "that the element of willfulness could not be proven in a

criminal prosecution for failing to include embezzled funds in gross income in the year of misappropriation so long as the statute contained the gloss placed upon it by Wilcox [the case being overruled] at the time the alleged crime was committed." *James v. United States,* 366 U.S. 213, 221–22, 81 S.Ct. 1052, 1057, 6 L.Ed.2d 246 (1961).

law must have existed when the conduct in issue occurred," Hall, General Principles of Criminal Law (2d ed 1960), at 58–59, must apply to bar retroactive criminal prohibitions emanating from courts as well as from legislatures. If a judicial construction of a criminal statute is "unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue," it must not be given retroactive effect.

*Id.* 378 U.S. at 353–54, 84 S.Ct. at 1702–1703, 12 L.Ed.2d at 899–900 (footnote omitted).

Recently, the Supreme Court held that a Florida statute reducing the amount of "gain time" which a prisoner could earn "for good conduct" and obedience of prison rules was "unconstitutional as an *ex post facto* law when applied to petitioner, whose crime was committed before the statute's enactment." *Weaver v. Graham,* 450 U.S. 24, 25, 101 S.Ct. 960, 962, 67 L.Ed.2d 17 (1981). The Court pointed out:

The *ex post facto* prohibition forbids the Congress and the States to enact any law "which imposes a punishment for an act which was not punishable at the time it was committed; or imposes additional punishment to that then prescribed." [Citations omitted.] Through this prohibition, the Framers sought to assure that legislative Acts give fair warning of their effect and permit individuals to rely on their meaning until explicitly changed. [Citations omitted.] The ban also restricts governmental power by restraining arbitrary and potentially vindictive legislation. [Citations omitted.]

In accord with these purposes, our decisions prescribe that two critical elements must be present for a criminal or penal law to be *ex post facto:* it must be retrospective, that is, it must apply to events occurring before its enactment, and it

must disadvantage the offender affected by it. [Citations omitted.]

*Id.* at 28–29, 101 S.Ct. at 963–964, 67 L.Ed.2d at 22–23 (footnotes omitted).

More than a half century before, in *Beazell v. Ohio,* 269 U.S. 167, 169–70, 46 S.Ct. 68, 69, 70 L.Ed. 216, 217 (1925), the Supreme Court observed: [11]

It is settled, by decisions of this Court so well known that their citation may be dispensed with, that any statute which punishes as a crime an act previously committed, which was innocent when done, which makes more burdensome the punishment for a crime, after its commission, or which deprives one charged with crime of any defense available according to law at the time when the act was committed, is prohibited as *ex post facto.*

However, in *Dobbert v. Florida,* 432 U.S. 282, 293, 97 S.Ct. 2290, 2298, 53 L.Ed.2d 344, 356 (1977), the Supreme Court emphasized that the prohibition against *ex post facto* laws does not extend to every change of law that "may work to the disadvantage of a defendant."

Further, in *Weaver v. Graham, supra,* the Supreme Court reiterated: [12]

We have also held that no *ex post facto* violation occurs if the change effected is merely procedural, and does "not increase the punishment nor change the ingredients of the offense or the ultimate facts necessary to establish guilt." [Citation omitted.]

450 U.S. at 29 n. 12, 101 S.Ct. at 964 n. 12.

The delicate analysis appropriate in examining a statutory change for a possible *ex post facto* violation was addressed in these terms in *Beazell v. Ohio, supra* 269 U.S. at 171, 46 S.Ct. at 69:

Just what alterations of procedure will be held to be of sufficient moment to transgress the constitutional prohibition

---

11. Quoted in *Dobbert v. Florida,* 432 U.S. 282, 292, 97 S.Ct. 2290, 2297, 53 L.Ed.2d 344 (1977).

12. Of course, the Court also cautioned that "[a]lteration of a substantial right, however, is not merely procedural, even if the statute takes a seemingly procedural form." 450 U.S. 24, 29

n. 12, 101 S.Ct. 960, 964 n. 12, 67 L.Ed.2d 17 (1981). Cf. *Kring v. Missouri,* 107 U.S. 221, 232, 2 S.Ct. 443, 452, 27 L.Ed. 506 (1883); *Cummings v. Missouri,* 71 U.S. (4 Wall.) 277, 18 L.Ed. 356 (1867); *Calder v. Bull,* 3 Dall. 386, 1 L.Ed. 648 (1798).

cannot be embraced within a formula or stated in a general proposition. The distinction is one of degree. But the constitutional provision was intended to secure substantial personal rights against arbitrary and oppressive legislation, *see Malloy v. South Carolina,* 237 U.S. 180, 183, [35 S.Ct. 507, 508, 59 L.Ed. 905], and not to limit the legislative control of remedies and modes of procedure which do not affect matters of substance, *see Gibson v. Mississippi,* 162 U.S. 565, 590, [16 S.Ct. 904, 910, 40 L.Ed. 1075]; *Thompson v. Missouri,* . . . [171 U.S. 380], 386, [18 S.Ct. 922, 924, 43 L.Ed. 204]; *Mallett v. North Carolina,* 181 U.S. 589, 597 [, 21 S.Ct. 730, 733, 45 L.Ed. 1015].

In *Beazell,* the Supreme Court rejected an *ex post facto* challenge to a statute which allowed the common trial of jointly indicted felons, when the statute in effect at the time of the alleged offense had required separate trials. Explaining that this change "operate[d] only in a limited and unsubstantial manner to . . . [petitioner's] disadvantage," [13] the Court referred to: [14] *Hopt v. Utah,* 110 U.S. 574, 4 S.Ct. 202, 28 L.Ed. 262 (1884), upholding application of "[a] statute which, after indictment, enlarge[d] the class of persons who . . . [might] be witnesses at . . . [defendant's] trial, by removing . . . [any] disqualification" by reason of felony conviction; *Thompson v. Missouri,* 171 U.S. 380, 18 S.Ct. 922, 43 L.Ed. 204 (1898), where an unsuccessful *ex post facto* claim was made against a statute which, after indictment, "change[d] the rules of evidence . . . so as to" allow admission against the defendant of evidence "previously held" excludable; *Gut v. Minnesota,* 76 U.S. (9 Wall.) 35, 19 L.Ed. 573 (1870), where a statute "change[d] the place of trial"; and *Duncan v. Missouri,* 152 U.S. 377, 14 S.Ct. 570, 38 L.Ed. 485 (1894), involving a statute which "abolishe[d] a court for hearing criminal appeals and created a new one in its stead."

In *Dobbert v. Florida, supra,* the Supreme Court considered the defendant's argument that, where the death-penalty statute existing at the time of his offense subsequently had been declared invalid by the Florida Supreme Court under the standard of *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), no death penalty statute was "in effect" at the time of his crime so to try him under a subsequently enacted death-penalty statute would result in an unlawful *ex post facto* application of the later legislation. Rebuffing this suggestion, the Court stated:

> But this sophistic argument mocks the substance of the *Ex Post Facto* Clause. Whether or not the old statute would in the future, withstand constitutional attack, it clearly indicated Florida's view of the severity of murder and of the degree of punishment which the legislature wished to impose upon murderers. The statute was intended to provide maximum deterrence, and its existence on the statute books provided fair warning as to the degree of culpability which the State ascribed to the act of murder.

*Dobbert v. Florida, supra* 432 U.S. at 297, 97 S.Ct. at 2300. Further the Court noted:

> Petitioner's highly technical argument is at odds with the statement of this Court in *Chicot County District v. Baxter State Bank,* 308 U.S. 371, 374, 60 S.Ct. 317, 318, 84 L.Ed. 329 (1940):
>
> "The courts below have proceeded on the theory that the Act of Congress, having been found to be unconstitutional, was not a law; that it was inoperative, conferring no rights and imposing no duties, and hence affording no basis for the challenged decree. [Citations omitted.] It is quite clear, however, that such broad statements as to the effect of a determination of unconstitutionality must be taken with qualifications. The actual existence of a statute, prior to such a determination, is an operative fact and may have consequences which cannot justly be ignored."

Accordingly, the Court ruled:

> Here the existence of the statute served as an "operative fact" to warn the peti-

---

**13.** 269 U.S. 167, 170, 46 S.Ct. 68, 69, 70 L.Ed. 216 (1925).

**14.** *Id.* at 170–71, 46 S.Ct. at 69.

tioner of the penalty which Florida would seek to impose on him if he were convicted of first-degree murder. This was sufficient compliance with the *ex post facto* provision of the United States Constitution.

432 U.S. at 297–98, 97 S.Ct. at 2300–2301.

### C

In applying these precedents to the case at bar, we believe that a distinction must be made in terms of the type of offense involved. Heretofore, beginning with *United States v. Ornelas,* 2 U.S.C.M.A. 96, 6 C.M.R. 96 (1952); *cf. United States v. Jessie,* 5 M.J. 573 (A.C.M.R.1978), *pet. denied,* 5 M.J. 300 (1978), we have drawn a distinction for some purposes between (a) purely military offenses, as to which disputed factual issues about the accused's status as a servicemember must be decided by the trier of fact as part of the determination of guilt or innocence and as to which the Government bears the burden of proof beyond reasonable doubt, and (b) those offenses which are not peculiarly military, as to which the question of jurisdiction over the person is resolved by the military judge as an interlocutory matter with the Government only being required to establish jurisdiction by a preponderance of the evidence. *See United States v. Laws,* 11 M.J. 475 (C.M.A.1981); para. 57*b* and *g,* Manual for Courts-Martial, United States, 1969 (Revised edition).

Thus, in the trial of purely military offenses, an issue of recruiter misconduct affecting the accused's military status has been submitted to the court members as an element of the offense to be proved beyond reasonable doubt. For example, in a case of unauthorized absence, the accused's status as a member of the Armed Services must be established in order to demonstrate that he was under a duty to be present. Article 86, UCMJ, 10 U.S.C. § 886; *United States v. Laws, supra.* On the other hand, if the accused were charged with murder, larceny, or some other offense not peculiar-

ly military, recruiter misconduct would only be an issue for the military judge to decide as an interlocutory matter. *United States v. Jessie, supra.*

In line with this established distinction, the retroactive application of the amendment to Article 2 to a purely military offense involves eliminating an issue which, under the law in effect at the time when the offense allegedly was committed, had to be submitted to the trier of fact and proved by the Government beyond a reasonable doubt. This raises a serious *ex post facto* issue, because in a sense it involves changing an element of the crime to be punished. Even if we eliminate the issue of recruiter misconduct by overruling our earlier decisions such as *United States v. Russo, supra* —on the ground that Congress has now made clear that the Court misinterpreted its legislative intent—the basic problem still remains; the Supreme Court has held that the retroactive overruling of a judicial decision can contravene due process because of the same considerations that underlie the prohibition on *ex post facto* laws. *See Marks v. United States,* 430 U.S. 188, 195–96, 97 S.Ct. 990, 994–995, 51 L.Ed.2d 260 (1977).

We conclude however, that the situation can be distinguished where the offense involved is not of a peculiarly military nature. For such offenses it has never been necessary to submit a disputed issue of military status to the trier of fact or for the Government to establish military status beyond a reasonable doubt. Here recruiter misconduct does not bear on an element of the offense, so the "defense" of recruiter misconduct is not, in our view, the type of "defense" which, according to *Beazell v. Ohio, supra,* may not be eliminated retrospectively. Instead, we consider the change in the so-called *Catlow-Russo* rule [15] to be only "procedural" in nature insofar as it concerns offenses *not* peculiarly military.

The 1979 amendment to Article 2 applies only to someone who has taken an

---

**15.** *United States v. Catlow,* 23 U.S.C.M.A. 142, 48 C.M.R. 758 (1974); *United States v. Russo,* 1

M.J. 134 (C.M.A.1975).

"oath of enlistment," *see* Article 2(b), UCMJ, 10 U.S.C. § 802(b), or who has "submitted voluntarily to military authority; ... received military pay or allowances; and ... performed military duties," *see* Article 2(c), UCMJ, 10 U.S.C. § 802(c). Those events are of such a nature that the person involved should be fully aware of the possibility that he may be tried by a court-martial for crimes he commits. Moreover, apart from the purely military offenses, he should already be aware of the type of conduct which may result in prosecution. Thus, his situation is somewhat akin to that of the defendant in *Dobbert v. Florida, supra,* who was on notice that his conduct was subject to punishment by death, even though a constitutional defect existed in the Florida death-penalty statute. In short, we interpret *ex post facto* limitations to be directed towards situations where someone may have acted in a certain way because he was not on notice that his conduct was unlawful. In situations involving claims that military jurisdiction does not exist because of recruiter misconduct, the accused has from the outset been placed on notice that he may be subject to trial by court-martial. Therefore, for offenses where status is not an element, we believe that Congress was not prohibited from applying the 1979 amendment of Article 2 to cases pending on appeal when it took effect.

Appellant was convicted of drug offenses. While military jurisdiction over such offenses is based largely on their prejudicial effect on military discipline and readiness, *United States v. Trottier,* 9 M.J. 337 (C.M. A.1980), such offenses are not peculiarly military, unlike unauthorized absence or disrespect to a superior officer.

### III

Appellant's drug offenses were not peculiarly military in nature; therefore, the amendment to Article 2 may be applied to them retroactively. Accordingly, the decision of the United States Army Court of Military Review is affirmed.

COOK, Judge (concurring in part):

I concur in the opinion of Chief Judge Everett except as to portions of section IIC.

*United States v. Ornelas,* 2 U.S.C.M.A. 96, 6 C.M.R. 96 (1952), cited there, is a unique case. Ornelas, a United States citizen by birth but a resident of Mexico from childhood, made inquiries about enlisting in the Army in 1943. He received a notice to report for physical examination and induction into the Army. He reported, took and passed the physical examination, but did nothing more. He was given permission to return to Mexico and did. He was never administered the oath of induction and never served in the Army. Under the provisions of the Selective Training and Service Act of 1940, 54 Stat. 885, 894, and applicable Army regulations, no person was subject to "court-martial ... unless ... actually inducted for the training and service." This Court, following *Billings v. Truesdell,* 321 U.S. 542, 61 S.Ct. 737, 88 L.Ed. 917 (1944), held that "the oath ceremony constituted the turning point in the transition from civilian to military," and, thus, "[i]f this accused did not participate in an induction ceremony, then he was never inducted, never became subject to military law, and could not be tried by court-martial for violations of that law." But we recognized that certain Federal cases

decided the issue of induction on other criteria than completing the oath ceremony. [Citations omitted.] However, these cases either arose after changes in Army Regulations relative to induction were made following *Billings v. Truesdell, supra,* or were based upon consideration such as *the acceptance of Army pay and other benefits, or the voluntary acquiescence in military obligations following induction.*

2 U.S.C.M.A. at 99, 6 C.M.R. at 99 (emphasis added). Since Ornelas was drafted in December 1943 and *Billings v. Truesdell, supra,* was decided in March, 1944, and the Army regulations were not changed until August 10, 1944, the rule established in *Billings v. Truesdell, supra,* would apply. Consequently, absent proper induction, Ornelas was not subject to trial by court-martial for the purely military offense of desertion.

However, in *United States v. Rodriguez,* 2 U.S.C.M.A. 101, 6 C.M.R. 101 (1952), decided the same day as *Ornelas,* we held that even where Rodriguez claimed that he had not taken the oath of enlistment, the facts that he did otherwise participate in the induction ceremony, did not object to service, and did in fact undergo basic training for some ten days, prevented him from claiming "that he was not lawfully inducted." *Id.* at 105, 6 C.M.R. at 105. The Court quoted from *Mayborn v. Heflebower,* 145 F.2d 864, 866 (5th Cir.1944), *cert. denied,* 325 U.S. 854, 65 S.Ct. 1087, 89 L.Ed. 1975 (1945):

> We are of the further opinion that whether or not all formalities prerequisite to induction were observed, the subsequent conduct of the parties was such that the irregularities were cured or the right to invoke them was waived. It is manifest that the induction officers regarded applicant as a soldier at all times after the induction ceremony was completed, and appellant voluntarily accepted the benefits and assumed the obligations incident to membership in the armed forces.

*Id.* at 105, 6 C.M.R. at 105.

In attempting to harmonize these two cases, Judge Brosman, the author judge in *Rodriguez,* wrote:

> The present case is readily distinguishable from *United States v. Ornelas, supra.* In that case, Ornelas testified that he did not at any time participate in an induction ceremony, and that he did not serve with the Army for any moment of time. Instead it was his contention that he merely took the required physical examination and returned immediately to his home in Mexico. Here, Rodriguez makes no claim that he did not participate in the induction ceremony, but only that he did not take the oath of allegiance. He did not object to service—in fact, he voluntarily entered upon the Army duty assigned. He proceeded to Fort MacArthur for basic training and remained in a military status, apparently without objection, for some ten days. Under such circumstances, he is in no position to claim that he was not lawfully inducted.

*Id.* at 104–05, 6 C.M.R. at 104–05.

Ornelas moved to dismiss charges on the ground that the court-martial had no jurisdiction since he had failed to take the oath of allegiance. The motion was denied twice by the law officer, who also refused to submit the issue of jurisdiction to the members under proper instructions. We held that the law officer erred in not submitting the factual question of whether Ornelas completed the induction ceremony to the members under appropriate instructions. Rodriguez, tried before *Billings v. Truesdell, supra,* and under the same Army regulations, also challenged the jurisdiction of the court on the theory that he had not been lawfully inducted into the service. His motion was likewise denied. No factual issue was submitted to the members for resolution. However, the Court accepted as true his testimony as to not taking the oath.

The only distinction I can see is that Rodriguez entered onto active duty, albeit for only some ten days. This apparently created a constructive enlistment as a *matter of law* in spite of Rodriguez' contention that he never took the oath.

I have expressed my "reservations about the continued validity of the *Ornelas* holding which requires the court members to resolve an issue of *in personam* jurisdiction when there are contested facts and a purely military offense is involved" because it represents "an unwarranted exception to the general rule that jurisdiction over person and offense is a question of law for the trial judge." *United States v. Laws,* 11 M.J. 475, 476 (C.M.A.1981). To make *Ornelas* the basis for a further distinction in the trial of military cases merely perpetuates the problem. *See United States v. Laws, supra* at 477 n. 5. I fail to see a valid difference between "military" and "non-military" offenses as they are affected by the amendments to Article 2.

I believe that our well-intentioned but wrong decision in *United States v. Russo,* 1 M.J. 134 (C.M.A.1975), is the cause of the

problem and should be overruled. *See United States v. Torres,* 7 M.J. 102, 107 (C.M.A.1979) (Cook, J., concurring). *Russo* has been rejected by Congress and discredited by the lead opinion here; it should be overruled.

FLETCHER, Judge (concurring in the result):

The Court of Military Review found the following facts, *inter alia,* which distinguish this case from *United States v. Torres,* 7 M.J. 102 (C.M.A.1979), and *United States v. Russo,* 1 M.J. 134 (C.M.A.1975):

> The defense counsel asked, "[W]hen it came time to talk to the recruiter for your enlistment in the service, what did you reveal to him concerning your drug usage?" McDonagh replied, "That I did drugs, and I specified what types; and I sold drugs [usually marihuana] to make money to buy drugs for myself."
>
> When asked "What was the recruiter's response when you told him that?" McDonagh said, "He kind of hedged, and wanted to side-step the whole issue, and he said 'Don't make any mention of this [,'] as far as I could recollect."
>
> Even so, McDonagh testified (and the record confirms) that he answered "yes" to question 37c on his Application for Enlistment, which was "Have you ever been involved in the use, purchase, possession or sale of marihuana, LSD, or any harmful or habit-forming drugs and/or chemicals except as prescribed by a licensed physician?" The "yes" answer was required to be explained in item 41, a space for "remarks." However, no entry was made in that item. McDonagh also testified that, as best he could recall, he also indicated his use of drugs on the medical history form he prepared for his physical examination, that he saw a doctor in connection with that examination, but that drugs were not discussed.
>
> The recruiter, a staff sergeant, signed the Application for Enlistment form, as did McDonagh, on 3 January 1976. Another recruiter, a master sergeant, signed on 5 January as accepting the enlistment. No medical forms pertaining to the enlistment were offered or introduced into evidence at the trial.

*United States v. McDonagh,* 10 M.J. 698, 701 (A.C.M.R.1981) (footnote omitted). The negligence of the second recruiter, not the fraudulent advice of his first recruiter, smoothed the path for the enlistment of appellant. Such a situation is outside the scope of the *Russo* doctrine. *See United States v. Valadez,* 5 M.J. 470, 475 (C.M.A. 1978).