**UNITED STATES**

v.

**Senior Airman Arthur W. FELIX, FR 266–31–4132 United States Air Force.**

**ACM S27465.**

U.S. Air Force Court of Military Review.

Sentence Adjudged 13 March 1987.

Decided 16 Sept. 1987.

**510**

Appellate Counsel for the Appellant: Joe Episcopo, Tampa, Florida, Colonel Leo L. Sergi.

Appellate Counsel for the United States: Colonel Joe R. Lamport, Lieutenant Colonel Robert E. Giovagnoni and Captain Jeffery H. Curtis.

Before SESSOMS, MICHALSKI and LEWIS Appellate Military Judges.

### DECISION

LEWIS, Judge:

The appellant was tried before members and was found guilty of wrongful use of cocaine between 23 and 29 September 1986. The offense was discovered as a result of urinalysis conducted on a urine sample which he provided pursuant to a unit inspection on 29 September 1986. Mil.R. Evid. 313. His approved sentence extends to a bad conduct discharge, confinement for four months and reduction to airman basic.

At trial and on appeal, the appellant has noted that a new standard for determining the positive level of benzoylecgonine in urine through the gas chromatography/mass spectrometry (GC/MS) confirmation test was placed into effect on 1 October 1986 and was subsequently applied retrospectively in his case. The GC/MS testing procedure measures the concentration of the aforementioned cocaine metabolite in urine. Prior to 1 October 1986 the Department of Defense confirmation standard for determining a positive cocaine urinalysis was 300 nanograms of benzoylecgonine per milliliter (300 ng/ml) of urine. By a memorandum dated 12 August 1986 the Assistant Secretary of Defense (Health Affairs) announced that the concentration level of 150 ng/ml would become effective for confirming a specimen as positive on 1 October 1986. The appellant's urine was tested by the GC/MS process in a contract laboratory on 31 October 1986 and was found to contain a benzoylecgonine concentration of 253 ng/ml. This result was reported to the appellant's unit as a positive cocaine detection in accordance with the 1 October standard. The appellant argues that this result would have been reported as negative rather than positive under the 300 ng/ml standard in effect during September 1986, the alleged period of the offense. Thus, he urges, the new standard was applied to his case in an improper *ex post facto* fashion. U.S. Const. Art. I, § 9, cl. 3.

■ A reading of the Assistant Secretary's memorandum leaves no doubt that the newly announced confirmation standard was to take effect on 1 October 1986. As a matter of necessity this standard was destined to be applied to a number of urine samples collected before the effective date, many of which were undoubtedly collected earlier in time than that of the appellant. The issue is whether the unavoidably retrospective operation of the new standard constituted an invalid *ex post facto* application. We put aside the question of whether the memorandum in question constituted a form of law such as was contemplated by our Constitutional drafters when they enunciated the *ex post facto* prohibition cited above. Suffice it to say that our reading of the case law satisfies us that the *ex post facto* prohibition has, over the years, been expanded substantially beyond purely statutory provisions. In this regard the opinions in *United States v. McDonagh*, 14 M.J. 415 (C.M.A.1983), and *United States v. Marsh*, 11 M.J. 698 (N.M.C.M.R.1981), provide excellent historical surveys of how the doctrine has been applied in a wide variety of contexts. In any event, we have concluded that the application of the 150 ng/ml confirmation standard did not constitute an *ex post facto* enforcement.

In *McDonagh, supra,* the Court of Military Appeals considered the retrospective application of an amendment of Article 2, U.C.M.J., to "not peculiarly military offenses" committed before enactment. Chief Judge Everett, in writing the lead opinion, relied heavily on Supreme Court decisions to the effect that not every change of law which works to the disadvantage of an accused is *ex post facto*, citing *Dobbert v. Florida*, 432 U.S. 282, 293, 97 S.Ct. 2290, 2298, 53 L.Ed.2d 344, 356 (1977),

14 M.J., at 420. He emphasized that "no *ex post facto* violation occurs if the change effected is merely procedural and does 'not increase the punishment nor change the ingredients of the offense or the ultimate facts necessary to establish guilt,'" quoting from *Weaver v. Graham*, 450 U.S. 24, 29, 101 S.Ct. 960, 964, 67 L.Ed.2d 17, 23 n. 12 (1981), *Id.*, 14 M.J. at 420. In determining that the amendment to Article 2 had not been applied in an *ex post facto* fashion in the case at hand, Judge Everett stated the military rule as follows: "In short, we interpret *ex post facto* limitations to be directed towards situations where someone may have acted in a certain way because he was not on notice that his conduct was unlawful." 14 M.J., at 423. Subsequent decisions construed the same amendment as being *ex post facto* when applied to "purely military offenses" on the theory that an essential element of such offenses was retrospectively altered, but did not disturb the rationale enunciated in *McDonagh*. *United States v. McGinnis*, 15 M.J. 345 (C.M.A.1983); *United States v. Marsh*, 15 M.J. 252 (C.M.A.1983).

When the Assistant Secretary's 12 August 1986 memorandum is viewed in light of *McDonagh*, it is clear enough that it established a procedural, as opposed to substantive, change. The offense of wrongful use of cocaine as it exists under Article 112a, U.C.M.J., 10 U.S.C. § 912a, and its elements were not altered. *See* M.C.M., Part IV, paragraph 37b(2) (1984). Neither was Air Force policy which informed the appellant in no uncertain terms that the illegal or improper use of drugs was incompatible with Air Force service and would not be tolerated. Air Force Regulation 30–2, *Social Actions Program*, para. 3–2a (18 April 1986). Thus, the applicable penal provision of the Code and the policy on drug use did not change on 1 October 1986. For the appellant to maintain a credible *ex post facto* challenge to the change in the confirmation testing standard he would have to assert that he was unfairly lulled into a permissive use of cocaine up to the level which would be determined as positive by application of the pre–1 October confirmation test standard of 300 ng/ml. Such an assertion would

ignore clearly established law and policy in addition to injecting a form of speculation so absurd as to require summary dismissal.

The military judge, in denying a motion to dismiss the charge and specification at trial, acknowledged that "as a practical matter" the appellant would not have faced trial if the pre–1 October standard had been in effect when his urine was placed through the GC/MS procedure. However, he summed up the appellant's situation correctly when he concluded, as follows:

As a result of the changed DoD standard for reporting as positive confirmation tests for the metabolite of cocaine: (1) the accused is not facing conviction for an act innocent when done; (2) the accused is not facing a more serious charge, nor greater punishment; and (3) there has been no alteration of the evidentiary or proof requirements at trial by court-martial.

We agree. The appellant's claim is without merit.

■ The appellant also argues that the finding of guilty must be reversed because the personnel at the contract laboratory deviated from the standard operating procedure when they conducted the GC/MS confirmation test on the appellant's urine. The appellant points to two deviations. One of five controlled specimens was subjected to the test procedure prior to calibration, and two of the known controls exceeded a 20 percent maximum margin of error as between the ng/ml benzoylecgonine level as tested and as actually injected into the control samples. We note that the directive establishing the drug testing program recognizes that test results are not automatically invalidated by "[e]rrors or other actions which are not prejudicial to the substantial rights of the service member under the rules of an applicable disciplinary or administrative proceeding." Department of Defense Directive 1010.1, *Drug Abuse Testing Program*, para. E2f(3) (December 28, 1984). Evidence of the alleged deviations was submitted to the triers of fact. Clearly, the members were persuaded beyond a reasonable doubt that these factors did not compromise the confirmation test results. The deviations were also emphasized by the appellant's counsel

at trial in argument on a motion for a finding of not guilty. Inasmuch as the military judge denied the motion, we must determine whether he abused his discretion in finding the presence of "some evidence which, together with all reasonable inferences and applicable presumptions, could reasonably tend to establish every essential element of the offense charged." R.C.M. 917(d).

We find that the military judge did not abuse his discretion in this regard. As to the first alleged deviation, the record fails to establish that the calibration, occurring after one of the known control samples was run, violated a specifically stated standard operating procedure of the laboratory. While the government expert witness acknowledged that sound laboratory procedures would have indicated running all control specimens after performing the calibration procedure, he nonetheless accepted the results of the ensuing test of the urine samples, including that of the appellant, as valid. A defense expert subsequently expressed a contrary view. Nevertheless, when the evidence is viewed in the light most favorable to the government, the deviation from accepted scientific laboratory procedure did not preclude the factual issue regarding the validity of the test from being presented to the triers of fact. R.C.M. 917(d).

The ng/ml test results for benzoylecgonine as to two of the three known control samples exceeded the 20 percent variation from the predetermined levels allowed for by the laboratory's standard operating procedure. These deviations were excessive only if one accepts that the three samples contained the ng/ml level of benzoylecgonine specified in the same standard operating procedure. The government witness testified that the controls used during the testing procedure contained different benzoylecgonine levels than as specified in the standard operating procedure and that the GC/MS results obtained were within the 20 percent margin for each of the three. This was the evidence which the military judge considered when he denied the motion for a finding of not guilty. This evidence also provided a sufficient basis, when viewed in the light most favorable to the prosecution, to support the denial of the motion. In the course of subsequent testimony the government expert explained that the control standards specified in the standard operating procedure were premised on the pre–1 October 300 ng/ml level for determining a positive test result. He testified that the control standards actually used on 31 October 1986, the date of the test of the appellant's urine, were more compatible with the post–1 October positive level of 150 ng/ml. The inference one might clearly draw from the totality of the testimony on the factual issue is that the laboratory was at fault not in employing improper control standards, but in not having properly documented the current control standards in its standard operating procedure on the date of the GC/MS test.

The military judge provided appropriate instructions to the members to assist them in evaluating the conflicting testimony of the expert witnesses. We find that the triers of fact had an ample basis for their finding of guilty. Based on our independent review of the evidence we are not satisfied that the laboratory personnel proceeded flawlessly in all particulars. We are, however, satisfied beyond a reasonable doubt that the GC/MS test conducted on the appellant's urine revealed the presence of a significant level of benzoylecgonine and that the appellant wrongfully used cocaine, as alleged. Article 66(c), U.C.M.J., 10 U.S.C. § 866(c); *United States v. Harper*, 22 M.J. 157 (C.M.A.1986).

Having examined the record of trial, the assignment of errors and the government's reply thereto and having considered the oral arguments of counsel, we have concluded that the findings and sentence are correct in law and fact and that no error prejudicial to the substantial rights of the accused was committed. Accordingly, the findings of guilty and the sentence are

AFFIRMED.

Senior Judge SESSOMS and Judge MICHALSKI concur.