UNITED STATES

v.

**Airman First Class Christopher T. PEDRAZOLI, FR392–98–6977, United States Air Force.**

**ACM S29230.**

U.S. Air Force Court of Criminal Appeals.

Sentence Adjudged 10 May 1996.

Decided 15 Jan. 1997.

Appellate Counsel for Appellant: Captain Margo Stone Newton (argued), Colonel Jay L. Cohen, Colonel David W. Madsen, Lieutenant Colonel Kim L. Sheffield, and Major Carol L. Hubbard.

Appellate Counsel for the United States: Major LeEllen Coacher (argued), Colonel Theodore J. Fink, and Lieutenant Colonel Michael J. Breslin.

Before PEARSON, MORGAN, C.H., II, and MORGAN, J.H., Appellate Military Judges.

## OPINION OF THE COURT

MORGAN, C.H., II, Judge:

In August of 1995, appellant and two fellow airmen who were also assigned to Davis–Monthan Air Force Base in Arizona, purchased cocaine in Nogales, Mexico, bringing it back across the border to the United States. Once across the border they took several lines of cocaine in the parking lot in appellant's car, and continued to consume the cocaine on the trip back to base. In the ensuing month, appellant took cocaine on at least two other occasions, once in the dormitory on base. He was brought to trial by special court-martial on May 10, 1996, and was convicted pursuant to his pleas of divers use of cocaine between on or about August 1, 1995, to on or about September 29, 1995. A military judge sentenced him to a bad-conduct discharge, confinement for four months, forfeitures of two-thirds pay per month for four months, and reduction to the lowest enlisted grade. Appellant's pretrial agreement did not factor on the adjudged sentence, as he had bargained for referral to a special-court martial, with its attendant jurisdictional limits on punishment.

On April 1, 1996, legislative amendments to the Uniform Code of Military Justice (UCMJ), enacted by Congress as part of the FY 1996 Department of Defense Authoriza-

tion Act, P.L. 104–106, enacted February 10, 1996, became effective. Appellant contends he was adversely affected by these amendments and that, as applied to him, they operate as an *ex post facto* law prohibited by U.S. Constitution, art. I, § 9, cl. 3. He urges upon us some unspecified sentencing relief, although he concedes that his sentence was within the jurisdictional limits of a special-court martial, limits which did not change from the time he committed his crime through the time of his conviction and sentencing. We hold that the February 10, 1996, amendments to the UCMJ which amended Article 57 and added Article 58b are not prohibited by the *Ex Post Facto* Clause of the Constitution.

## UCMJ Amendments

Two sections of Title XI of P.L. 104–106 are at issue. The first, section 1121(a)(1), amended Article 57 of the UCMJ, 10 U.S.C. § 857, to change the effective date for forfeitures and grade reduction to the earlier of 14 days after sentence is adjudged or the convening authority's action. Under the previous version of Article 57, forfeitures did not commence until after the convening authority took action on the sentence. Reductions in grade were not covered.

Congress also added a new section to the UCMJ. Section 1122(a)(1) of P.L. 104–106, codified as Article 58b, 10 U.S.C. § 858b, in pertinent part declares that one sentenced to confinement for more than six months, or to any period of confinement and a punitive discharge, shall forfeit two-thirds pay and allowances[1] in the case of a special court-martial, and total forfeitures in the case of a general court-martial during the period of confinement. Both of these amendments were to become effective for any case "in which a sentence is adjudged by a court-martial on or after the first day of the first month that begins at least 30 days after the date of enactment of this Act." Act of Feb.

10, 1996, P.L. 104–106, Div A, Title XI, Subtitle B, § 1122(b), 110 Stat. 186, 463. This works out to apply to any case tried on or after April 1, 1996.

## Standing

▮ It is axiomatic to constitutional practice that one challenging the constitutionality of a statute must have standing to do so, that is, he must have suffered some direct or palpable injury from the act. *Fleming v. Rhodes,* 331 U.S. 100, 67 S.Ct. 1140, 91 L.Ed. 1368 (1947). One who is not prejudiced by the enforcement of an act cannot question its constitutionality. *Monamotor Oil Co. v. Johnson,* 292 U.S. 86, 96, 54 S.Ct. 575, 579, 78 L.Ed. 1141 (1934). Appellant's standing with respect to his attack on Article 57 is straightforward. Finance records supplied pursuant to this court's order reveal that he was, as the law requires, reduced to pay grade E–1 and that forfeitures commenced (albeit by fits and starts) on May 25, 1996, fourteen days after the announcement of his sentence. Since the convening authority did not take action until June 25, 1996, appellant was affected by the earlier reduction and commencement of forfeitures occasioned by the operation of the amended Article 57.

▮ Appellant's standing with respect to Article 58b is less clear. The government argues that, because appellant has suffered no direct impact from the application of Article 58b, he cannot complain of it. This, the government continues, is because Article 58b was not triggered at all. The military judge, in addition to sentencing appellant to a punitive discharge and jail time, sentenced him to forfeit two-thirds of his pay per month for four months. These forfeitures are the same as would have automatically occurred by operation of Article 58b had the judge announced no forfeitures or some amount less than he did.

---

1. By including the words "and allowances" in reference to the forfeitures obtaining in a special court-martial, as originally enacted, Article 58b left open the possibility of a sentence which exceeded the jurisdictional limits of a special court-martial. *See* Article 19, UCMJ, 10 U.S.C. § 819. A technical correction was enacted in the FY 97 Authorization Act which struck these words. Appellant, who was single and living in the dorm at the time of trial, concedes that the allowance issue forms no part of his case inasmuch as he had no allowances affected by the provision.

Standing, when one speaks of the application of *ex post facto* analysis to a sentence, is a tricky thing. The Supreme Court has "squarely held" that "an individual prisoner need not prove that the retroactive application of a law authorizing an increased punishment for a past offense has actually affected the sentence that that prisoner must serve." *California Department of Corrections v. Morales,* —— U.S. ——, ——, 115 S.Ct. 1597, 1607, 131 L.Ed.2d 588 (1995) (Stevens, J., dissenting), *citing Lindsey v. Washington,* 301 U.S. 397, 57 S.Ct. 797, 81 L.Ed. 1182 (1937). In Lindsey's case, the Court ruled invalid, as *ex post facto,* a Washington law changing what had been the maximum sentence for Lindsey's crime, 15 years, into the minimum sentence. Lindsey was sentenced to serve 15 years in prison. Notwithstanding that the sentence Lindsey served was permissible under the old regime, the Court decided that raising the floor of the permissible range of punishments *ex post facto* was little different from raising the ceiling. Practically speaking, it would have been impossible for Lindsey to have established that he received 15 years jail time as a result of the new law, since it was a permissible punishment under the old.

In our case, however, the military judge betrayed an apparent belief that the law constrained him to adjudge maximum forfeitures, whether or not he personally believed that to be an appropriate component of the sentence. In explaining to appellant the consequences of his guilty plea, the military judge advised:

> MJ: Also, I need to make certain Airman Pedrazoli is aware of a recent change in the law, that if there is a punitive discharge in conjunction with confinement, that forfeiture is [sic] up to the jurisdictional limits during such time of confinement, have [sic] now been mandated by law.
> Do you understand this change in the law? (Defense counsel and the accused confer.)
> ACC: Yes sir.
> MJ: I might note for counsel, because of the change in the law and the mandatory forfeiture, if there is adjudged in this case a punitive discharge in conjunction with

confinement, it would be likely I would be announcing forfeitures to the jurisdictional limits that are mandated, so it would probably be announced at—two thirds pay per month. . . . I mention that now in case counsel wish to make any comment at a later time on that point.

The military judge's laudable candor apparently rested on his belief that the new law constrained his sentencing discretion. But if the treatment of the parallel provision in the UCMJ, Article 58a (providing for automatic reduction to E–1 in certain cases) is any guide, the military judge was mistaken. He was free to adjudge forfeitures in any amount, or not at all, as he saw fit within the jurisdictional limitations of the forum. *See* R.C.M. 1003(b)(5) (Discussion); *United States v. Powell,* 30 C.M.R. 288, 1961 WL 4439 (C.M.A.1961) (holding that the automatic reduction provision of Article 58a was not a judicially imposed punishment, but "an administrative consequence of the enumerated sentence.").

Of course, we cannot be sure whether, in the absence of Article 58b, the military judge would have imposed maximum forfeitures anyway, but his remarks on the record suggest to the contrary. Certainly, the issue of standing would have been cleaner if the military judge had imposed some lesser forfeiture and Article 58b had operated independently to increase the forfeitures beyond those adjudged. Still, this factual ambiguity seems to be just the kind of situation facing the Supreme Court in *Lindsey,* and we resolve it the same way, deciding that appellant does have standing to contest Article 58b.

### Applicable Precedent

The Supreme Court's most recent pronouncement on the *Ex Post Facto* Clause as it applies to the sentence of convicted prisoners confirms the Court's announced return to the fundamental principles of *Calder v. Bull,* 3 U.S. (3 Dall.) 386, 390–391, 1 L.Ed. 648 (1798) and *Beazell v. Ohio,* 269 U.S. 167, 169–170, 46 S.Ct. 68, 68–69, 70 L.Ed. 216 (1925), namely, that the Clause is aimed at laws which "retroactively alter the definition of crimes or increase the punishment for criminal acts." *Morales,* —— U.S. at ——, 115

S.Ct. at 1601 (quoting *Collins v. Youngblood,* 497 U.S. 37, 43, 110 S.Ct. 2715, 2719–20, 111 L.Ed.2d 30 (1990)). *Collins* signalled the Court's belief that *ex post facto* analysis had strayed too far from its constitutional moorings, particularly with respect to defining which laws were, and which were not, properly the subject of *ex post facto* analysis.[2]

The *Morales* Court went on to discredit, although it did not specifically overrule, *Lindsey v. Washington,* 301 U.S. 397, 57 S.Ct. 797, 81 L.Ed. 1182 (1937); *Miller v. Florida,* 482 U.S. 423, 107 S.Ct. 2446, 96 L.Ed.2d 351 (1987); and *Weaver v. Graham,* 450 U.S. 24, 101 S.Ct. 960, 67 L.Ed.2d 17 (1981) insofar as they seemed to expand coverage of the *ex post facto* proscription to any law which retroactively "disadvantaged" a criminal defendant. Nevertheless, appellant's reliance on this trilogy of cases warrants a brief factual recitation of each.

Lindsey was convicted of grand larceny at a time when the maximum sentence was no more than 15 years. By the time he came up for sentencing, however, the *minimum* sentence was 15 years, which is what Lindsey got. There was no maximum. What had been the ceiling was now the floor.

Weaver was convicted pursuant to his plea of second-degree murder and sentenced to a prison term of 15 years. After he had already begun serving his time the statute which controlled the computation of "gain time" was amended, effectively lengthening the time he would spend in prison from that period which would have been calculated us-

ing the earlier formula. Effectively, the "ceiling" on Weaver's prison term was raised.

Finally, Miller found himself subjected to new sentencing guidelines. At the time he committed his crime the presumptive sentencing range was from 3½ to 4½ years, but at the time of his sentencing, the range had been boosted to 5½ to 7 years. Miller was sentenced to 7 years. The Supreme Court, acknowledging that a 7 year sentence was a possibility under the old regime, nevertheless decided that, *de facto,* if not *de jure,* the ceiling had been raised.

Finding a Supreme Court precedent on all fours with the case before us is improbable. One unfamiliar with the idiosyncrasies of our military jurisprudence might be surprised to learn that military prisoners awaiting execution of a punitive discharge are paid at all, much less that they might receive full pay and allowances. The payment of other than a nominal wage to a prisoner is alien to common penology, and so forms no part of the bibliography of *ex post facto* precedent before us. Hence, there is no Supreme Court precedent treating with the *Ex Post Facto* Clause as it relates to forfeiture of pay. Since cases dealing with the *Ex Post Facto* Clause as it relates to sentencing invariably deal in some manner or another with confinement and its duration, we have no Supreme Court guidance on the difference, if there be any, between the liberty interests which are at stake in typical *ex post facto* litigation, and the interests inhering in forfeitures.[3]

**2.** The Court overruled *Kring v. Missouri,* 107 U.S. 221, 2 S.Ct. 443, 27 L.Ed. 506 (1883) and *Thompson v. Utah,* 170 U.S. 343, 18 S.Ct. 620, 42 L.Ed. 1061 (1898). In the Court's view, these cases represented an unwarranted departure from proper *ex post facto* analysis in that they had expanded the definition of an *ex post facto* law to be one which "in relation to the offense or its consequences, alters the situation of a party to his disadvantage." *Youngblood,* 497 U.S. at 47, 110 S.Ct. at 2721 (quoting *Kring,* 107 U.S. at 228–29, 2 S.Ct. at 449–50). "Neither of these decisions, in our view, is consistent with the understanding of the term 'ex post facto law' at the time the Constitution was adopted." *Youngblood,* 497 U.S. at 47, 110 S.Ct. at 2722.

**3.** Loss of pay has been the rule, rather than the exception, for convicted military offenders await-

ing execution of a punitive discharge. Before 1914, a dishonorable discharge was executed at the conclusion of the court-martial, so that an enlisted prisoner entered into confinement already separated from the service, and hence entitled to no pay. *See United States v. Cleckley,* 23 C.M.R. 307, 310, 1957 WL 4485 (Quinn, J., dissenting). The Act of March 4, 1915, 38 Stat. 1065, provided that "pay and allowances shall not accrue to a soldier under sentence of dishonorable discharge," during any period of suspension. It was replaced by a similar provision which provided for the cessation of entitlement to pay and allowances for any member of the Army who was confined and had been sentenced to a dishonorable discharge, pending execution of the discharge. Act of August 10, 1956, 70A Stat. 208, 10 U.S.C. § 3636.

This is not to say that *ex post facto* analysis is new to our judicial regime. The Court of Appeals for the Armed Forces, then the Court of Military Appeals, grappled with the issue in *United States v. McDonagh,* 14 M.J. 415 (C.M.A.1983), but in a context somewhat out of the mainstream of *ex post facto* jurisprudence—court-martial jurisdiction. The Court finessed the question of its authority (although there was no indication it was raised) by construing the statute in such a way as to obviate any *ex post facto* concerns, holding that the elimination of recruiter misconduct as a jurisdictional defense was procedural in nature. *See also United States v. Felix,* 25 M.J. 509 (A.F.C.M.R.1987) (change in DoD standards for drug urinalysis testing not violative of *ex post facto* prohibition), *pet. denied* 26 M.J. 65 (C.M.A.1988). The approach taken by the *McDonagh* and *Felix* opinions has application to our analysis here, as we shall see later.

### Appellant's Article 57 Claim

■ With the above precedent as backdrop, disposition of appellant's Article 57 claim is straightforward.[4] The Article 57 amendment does not violate the *ex post facto* prohibition, as it does no more than (potentially) accelerate the time when reductions in grade and forfeitures can commence. Duration is not increased. Appellant fashions an ingenious argument to the effect that his punishment has been enhanced, noting that oftentimes offenders never fully suffer adjudged forfeitures because they complete their sentence to confinement and go on appellate leave without pay before full forfeitures have been extracted. In effect, appellant argues this administrative serendipity is a substantial, constitutionally protected right at the time he snorted coke. We may with some justification infer that this very situation to which appellant claims entitlement might have been what stimulated Congress to act as it did. The important consideration, for purposes of *ex post facto* analysis, is that appellant's sentence was not enlarged one whit through the operation of an amended Article 57. If the forfeitures began sooner, likewise they ended sooner,[5] and in any case no later than four months after they began.

The analysis is no different with respect to the reduction in grade. The effective date of the reduction is, at most, a procedural incident of the sentence. It does not create any risk of increasing the measure of punishment attaching to appellant's crime. *Morales,* —— U.S. at ——, 115 S.Ct. at 1603.

### Article 58b

■ When appellant took cocaine in August and September of 1995, under the UCMJ he was on notice that he faced a

---

4. We undertake this analysis recognizing there may be an issue as to the authority of an Article I court to declare an act of Congress unconstitutional. The seminal case of *Marbury v. Madison,* 1 Cranch 137, 2 L.Ed. 60 (1803), hinged justification for judicial review on the constitutional basis of separation of powers. Our lone foray into Article III territory unarmed with clear precedent from the Supreme Court, *United States v. Fagg,* 33 M.J. 618 (A.F.C.M.R.1991) (holding Article 125 as it applied to private, heterosexual, consensual sodomy unconstitutional), was summarily rebuffed. Writing for a unanimous Court of Military Appeals, now Chief Judge Cox wrote, "we detect no indication from the Supreme Court which permits us to override the intent of Congress." *United States v. Fagg,* 34 M.J. 179, 180 (C.M.A.1992). Our research discloses no Supreme Court case deciding whether an Article I court can declare, *ab initio,* a legislative enactment of Congress unconstitutional. That there are limitations to the judicial power of Article I tribunals cannot be gainsaid. *See, e.g., Northern Pipeline Const. Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982);

*Palmore v. United States,* 411 U.S. 389, 93 S.Ct. 1670, 36 L.Ed.2d 342 (1973). *See also Glidden Co. v. Zdanok,* 370 U.S. 530, 82 S.Ct. 1459, 8 L.Ed.2d 671 (1962); *Reid v. Covert,* 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957). Professor Fallon argues that any uncertainties in this respect might well be cured by making the Court of Appeals for the Armed Forces an Article III court. Richard H. Fallon, Jr., *Of Legislative Courts, Administrative Agencies, and Article III,* 101 Harv.L.Rev. 916 (1988). Without intimating a result either way, our resolution of this issue adversely to appellant leaves the question for another day.

5. Both parties furnished us with copies of appellant's pay records. We do not pretend to fathom the glyphic array of entries, as we were not furnished with an equivalent to the Rosetta Stone. But it is clear that forfeitures commenced, true to the law, 14 days after the announcement of sentence. Appellant does not claim that any money in excess of the adjudged forfeitures was taken.

possible maximum punishment of a dishonorable discharge, confinement for 5 years, forfeiture of all pay and allowances, and reduction to the lowest enlisted grade. MANUAL FOR COURTS-MARTIAL, UNITED STATES, Part IV, ¶ 37(e)(1)(a) (1995 ed.). Conversely, the minimum punishment for that conviction was no punishment. Article 58b did not change the maximum or minimum sentence, nor did it establish a new presumptive sentencing range at the time of trial, nor did it tinker with the calculation of "good time," the earliest release date, or parole eligibility. Both the floor and the ceiling remained where they were. Under *Youngblood* and *Morales,* there the inquiry might end.

However, appellant likens his case to those of *Weaver, Miller,* and *Lindsey.* He argues that the automatic loss of pay changed the "measure of punishment" analogously to recalculation of "gain time" or raising the *de facto* sentencing range. Noting that, at best, those cases enjoy limited vitality post-*Morales,* we find they do not control here.

In the first place, there is a qualitative, judicially cognizable difference between the potential loss of pay while a prisoner versus the *ex post facto* impairment of a fundamental liberty interest. Military pay and allowances are the creature of statute, stemming from Congress' constitutional authority to raise and maintain the armed forces. *Bell v. United States,* 366 U.S. 393, 401, 81 S.Ct. 1230, 1235, 6 L.Ed.2d 365 (1961). Congress could, without notice, reduce the pay of *all* members of the Armed Forces, or, as has occurred in our history, simply fail to appropriate money for pay. There is no constitutional, vested, nor even contractual right to be paid in derogation of statutory authority. With that in mind, it cannot be that one's right to pay should be *enhanced* by reason of status as an adjudicated prisoner facing a punitive discharge.

The case of *United States v. Larionoff,* 431 U.S. 864, 97 S.Ct. 2150, 53 L.Ed.2d 48 (1977), is instructive in this latter respect. Larionoff had reenlisted in the Navy for six years in anticipation of a reenlistment bonus in what was, for a time, a critical military skill. He duly enrolled in, and graduated from, specialized training in that critical military

skill. However, by the time Larionoff came to collect his bonus, his specialty had been downgraded, along with the size of his bonus. In analyzing Larionoff's claim, the Supreme Court reaffirmed *Bell,* writing, "No one disputes that Congress may prospectively reduce the pay of members of the Armed Forces, *even if that reduction deprived members of benefits they had expected to be able to earn." Larionoff,* 431 U.S. at 879, 97 S.Ct. at 2159 (emphasis added). Nor does the adverb "prospectively" further appellant's argument. On the contrary, Article 58b did not take away, directly or otherwise, any pay appellant had already earned or accrued previous to his conviction.

While *Lindsey* and *Miller* may be distinguished because in both cases the sentencing range actually changed, strictly speaking that distinction does not hold for *Weaver.* What distinguishes *Weaver* is that he entered his guilty plea under a readily calculable assumption as to how much time he would actually spend in prison. The change in "gain time" dashed these calculations and ineluctably increased his actual jail time. The Supreme Court attached great importance, as do we, to the fact that the change in law occurred *after* Weaver's guilty plea, observing "that a prisoner's eligibility for reduced imprisonment is a significant factor entering into both the defendant's decision to plea bargain and the judge's calculation of the sentence to be imposed." *Weaver,* 450 U.S. at 32, 101 S.Ct. at 966.

Because appellant entered his plea of guilty fully apprised of the ramifications of Article 58b, having been briefed thereon by the military judge, he cannot squeeze himself into the logic of *Weaver*'s holding. This is more than a technical distinction, but goes directly to the foundational purposes of the *Ex Post Facto* Clause served by the *Weaver* reasoning. In plain language, the Clause was incorporated into our Constitution so that one contemplating a given act should first know of its criminality, and second, of its penal ramifications. Both the criminality of cocaine use, and the maximum punishment therefor, remained constant from appellant's usage through his conviction and sentence. Looking to the purposes underlying the *ex*

*post facto* prohibition, we will not credit the fatuous notion that appellant was lulled into snorting cocaine by reason of his understanding that he could be punitively discharged and confined yet not suffer the loss of his pay. *Felix,* 25 M.J. at 511.

Third, our superior Court has considered the parallel provisions of Article 58a in such a fashion as to resolve, *a fortiori,* any question as to whether Article 58b represented an enhancement of punishment such as to fall under coverage of the *ex post facto* prohibition. In *United States v. Powell,* 30 C.M.R. 288, 289, 1961 WL 4439 (C.M.A. 1961)[6], the Court rejected the contention that the automatic reduction provision of Article 58a served to increase the adjudicated sentence of the court-martial. It concluded instead that the reduction was "an administrative consequence of the enumerated sentence ... merely declaratory of the services' undoubted authority administratively to reduce any accused whose punishment comes within its terms." *Compare Cleckley,* 23 C.M.R. at 308–09. The *Powell* holding, though the subject of emphatic dissent, has been incorporated into our present Manual for Courts–Martial, which comments: "Reduction under Article 58a is not a part of the sentence but is an administrative result thereof." R.C.M. 1003(b)(5) (Discussion). Since we discern that none of the purposes of the *Ex Post Facto* Clause of the Constitution would be served by enlarging its coverage to appellant's case, we reject his appeal on that basis.[7] We conclude, therefore, that the enactment of what is now Article 58b did not offend the Constitution's prohibition against *ex post facto* laws.

6. Examination of the relevant dates strongly suggests that Article 58a, which was enacted July 12, 1960, was in all probability effective well after Powell committed his larceny. The Court of Military Appeals opinion issued April 21, 1961, just nine months after enactment. Even in the halcyon days of yesteryear, we are hard put to believe that Powell committed a larceny, was tried, convicted, then prosecuted his appeal through the Air Force Board of Review and thence to the Court of Military Appeals who then issued an opinion—all within nine months. We attribute the absence of an *ex post facto* argument to a recognition of its want of merit, and not, as does our concurring brother, to the lassitude of Powell's counsel.

## Remaining Assignments of Error

█ Appellant's remaining assignments of error may be disposed of summarily. A new convening authority's action is not necessary inasmuch as it is clear that the convening authority had, and considered, the appellant's grandmother's clemency submission. Even though the letter was not listed as an attachment to the addendum to the staff judge advocate's recommendation, it was mentioned in the body of the addendum, and was included in the proper place in the record of trial. Furthermore, the convening authority, in a post-trial affidavit, declares that although he cannot remember for certain if he saw that letter, after specifically considering it, he is unmoved to change his mind. We are persuaded that he did see the letter in the first instance, but in any event, his subsequent consideration of the letter dispels any possibility of prejudice.

Appellant's final assignment of error is likewise without merit. The adjudged sentence by the military judge is clear, and clearly stated. The articulation of that sentence in the court-martial order, while convoluted, at least resulted in an approved sentence which was in all respects congruent with that adjudged.

## Conclusion

Having examined the record, assignments of error, and submissions of the parties, we hold the findings and sentence to be correct in law and fact, the sentence is appropriate, and the same are hereby

AFFIRMED.

Judge J.H. MORGAN concurs.

7. Appellant entered into his plea advisedly, having already secured a sizable sentencing concession from the government, reducing his potential exposure from a dishonorable discharge, confinement for 5 years, total forfeitures, and reduction to airman basic, to the comparatively mild jurisdictional limits of a special court-martial. In light of this, appellant's argument appears to be a constitutional circumlocution which ends up with the conclusion that his guilty pleas were improvident. It could be argued, although the government does not do so, that in pleading guilty after being advised of the consequences of the new amendments to the UCMJ, he advisedly waived any *ex post facto* arguments he might have.

PEARSON, Senior Judge (concurring in the result):

The *ex post facto* issue in this case boils down to whether a duck is still a duck even though some bird expert calls it a bald eagle.

I agree that the amendment to Article 57, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 857, which moved up the effective date of monetary forfeiture and reduction in grade punishments was only an "administrative" change which does not violate the Constitution's *Ex Post Facto* Clause. *See* U.S. CONST. art. I, § 9, cl. 3. However, I disagree with the majority's analysis with respect to the new Article 58b provision.

Article 58b escalates some sentences by imposing an automatic monetary forfeiture even though no forfeiture, or a sum below the statutory amount, was adjudged at trial and the offense occurred before the provision's enactment. 10 U.S.C. § 858b. This new automatic forfeiture provision looks like, acts like, and smells like an *ex post facto* law (the duck) despite anyone's attempt to call it an "administrative consequence" of a sentence (a bald eagle). Nevertheless, I concur in affirming this case because appellant knowingly waived the issue.

### *Article 58b and Ex Post Facto*

In 1798, the Supreme Court laid down some very simple tests for determining whether Congress passed a prohibited *ex post facto* law:

> 1st. Every law that makes an action, done before passing of the law, and which was innocent when done, criminal; and punishes such action. 2d. Every law that aggravates a crime, or makes it greater than it was, when committed. 3d. Every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed. 4th. Every law that alters the legal rules of evidence, and receives less, or different, testimony, than the law required at the time of the commission of the offense, in order to convict the offender.

*Calder v. Bull,* 3 Dall. 386, 390, 1 L.Ed. 648 (1798) (Justice Chase). *See also Beazell v.*

*Ohio,* 269 U.S. 167, 169–170, 46 S.Ct. 68, 68–69, 70 L.Ed. 216 (1925).

While the Supreme Court has tinkered with these tests over the last two centuries, today we apply the same fundamental *ex post facto* analysis set out in 1798. *See California Department of Corrections v. Morales,* —— U.S. ——, 115 S.Ct. 1597, 131 L.Ed.2d 588 (1995). The new Article 58b, effective for trials on or after April 1, 1996, fails the third test in some cases by automatically "inflict[ing] a greater punishment" on an accused for an offense committed before its enactment.

Under the new provision, accused who are sentenced to more than 6 months confinement, or any confinement and a punitive discharge, now receive a monetary forfeiture of all pay and allowances in a general court-martial, and two-thirds pay in a special court-martial, by operation of law, a situation that did not exist under the UCMJ before April 1, 1996. In effect, the provision increases an accused's adjudged sentence by adding **maximum** monetary forfeitures to the sentence even if no forfeiture, or an amount below the statutory sum, was adjudged at trial. Where the accused committed the offense before the effective date of the new provision, the statute "inflicts greater punishment, than the law annexed to the crime, when committed." *Calder v. Bull,* 3 Dall. at 390, 1 L.Ed. 648.

The majority calls this punishment escalator an "administrative consequence" and cites *United States v. Powell,* 30 C.M.R. 288, 1961 WL 4439 (C.M.A.1961). I agree that over 30 years ago, the Court of Military Appeals, now the Court of Appeals for the Armed Forces, with one judge dissenting, used that language in *Powell* when concluding that the automatic reduction in grade provision of Article 58a, UCMJ, 10 U.S.C. § 858a, which Congress enacted on July 12, 1960, did not increase an adjudged sentence. However, the Court specifically did not address the *ex post facto* issue in its opinion; therefore, I do not feel *Powell* dictates the label we place on Article 58b.

Even if *Powell* does control, I urge the Court of Appeals for the Armed Forces to treat the issue differently these three decades later. It appears pretty clear to me

that the automatic reduction was also an *ex post facto* law if it was used to reduce an accused to the lowest enlisted grade when the accused committed the offense before Article 58a's effective date and was not sentenced to such a reduction at trial. To say that the statute did not increase that accused's punishment after the offense was committed, but merely worked an "administrative consequence," is calling a duck, a bald eagle. *See Powell,* 30 C.M.R. at 290 (Latimer, J., dissenting).

In this regard, the services have their own methods of "administratively" demoting enlisted members separate and apart from the military criminal code. *See* Air Force Instruction 36–2503, *Administrative Demotion of Airmen* (Jul.1994). Moreover, the language of Articles 58a and 58b embrace terms of punishment which a court-martial may adjudge, "reduction" and "forfeiture." *See* R.C.M. 1003. And, both provisions were enacted as changes to the military's basic criminal code, not some pure fiscal statute controlling the payment or grade of service members. *Cf. United States v. Cleckley,* 23 C.M.R. 307, 1957 WL 4485 (C.M.A.1957) (construing fiscal law providing for automatic total forfeitures of anyone serving confinement while pending a dishonorable discharge).

In conclusion, the constitutional *ex post facto* limitation here is simple. Congress may change a sentencing scheme to make it more burdensome on an accused, but may not apply the change to an offense committed before the legislation's enactment if the change (1) increases the maximum punishment for the offense, or (2) increases the effective minimum punishment or "floor" for the offense. *See Miller v. Florida,* 482 U.S. 423, 107 S.Ct. 2446, 96 L.Ed.2d 351 (1987) (increase in presumptive sentencing range from 3 ½–4 ½ years to 5 ½–7 years was an increase in the quantum of punishment).

Here, Congress effectively increased the floor for some individuals by making maximum forfeiture of pay an automatic part of their sentence even if a forfeiture was not adjudged at trial, or was adjudged in a lesser sum. If Congress may enact "automatic" punishments of reduction and forfeiture, and

impose them for offenses committed before its legislation, Congress may also enact automatic terms of imprisonment for offenses committed before its legislation. Did our founding fathers really intend for that to occur? I hope not.

### Standing

I agree with the majority that appellant has standing to contest the application of Article 58b to his case in light of the military judge's explanation to him about the new provision. However, I offer a few additional comments. The government argues in this case, and many companion cases, that an appellant must show finance officials actually collected money under the new statute before the appellant may argue any "prejudice" from the new provision. I put the burden on the other foot by applying the usual presumption of regularity in the conduct of governmental affairs—if a statute says an accused must forfeit something then I presume the government's employees took the necessary steps to accomplish that task absent evidence to the contrary. *See United States v. Masusock,* 1 C.M.R. 32, 1951 WL 1504 (C.M.A.1951).

### Waiver

While appellant has standing to contest the application of Article 58b to his case, he waived that issue by not raising it until his case landed at our doorstep. In explaining the consequences of appellant's guilty plea, the military judge told appellant that the new Article 58b mandated forfeitures "to the jurisdictional limits" of the court if the sentence included a punitive discharge in conjunction with confinement. Appellant indicated that he understood. The judge added that it "would be likely [he] would be announcing forfeitures to the jurisdictional limits that are mandated" if he adjudged a punitive discharge and confinement, and offered counsel an opportunity to "make any comment at a later time on that point." Defense counsel offered no comment then, or later, nor did appellant.

Whether an issue survives for appellate review when not raised below depends on whether it was waived or merely forfeited.

"Waiver is different from forfeiture. Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the 'intentional relinquishment or abandonment of a known right.'" *United States v. Olano,* 507 U.S. 725, 733, 113 S.Ct. 1770, 1777, 123 L.Ed.2d 508 (1993).

An issue which is merely forfeited may survive on appeal because of the plain error doctrine. Under the plain error doctrine, an appellate court will grant relief despite a forfeiture if the asserted error was obvious, substantial, and had an unfair prejudicial impact on the case. *Olano.* However, appellate courts do not apply the plain error doctrine when an appellant knowingly and intelligently waives an issue unless the law expressly provides that the issue may not be waived. *See United States v. Strachan,* 35 M.J. 362, 364 (C.M.A.1992), *cert. denied,* 507 U.S. 990, 113 S.Ct. 1595, 123 L.Ed.2d 159 (1993); *United States v. Pagel,* 40 M.J. 771, 776 (A.F.C.M.R.1994); *United States v. Spears,* 39 M.J. 823 (A.F.C.M.R.1994).

For example, under military law, issues of lack of jurisdiction and failure to state an offense, R.C.M. 907(b), and unlawful command influence, *United States v. Blaylock,* 15 M.J. 190 (C.M.A.1983), are never waived. Thus, an *ex post facto* claim that a law fails the first *Calder* test by making something criminal that was innocent when done could not be waived—the same should not hold true for an issue involving a question of mere dollars and cents under the third test in *Calder.*

Absent some express, binding judicial, legislative, or executive guidance, however, we should not encourage accused to forego timely objections and motions to correct issues when first confronted with them. Otherwise, we promote piecemeal litigation which doesn't serve the public interest. *See United States v. Huffman,* 40 M.J. 225, 228–29 (C.M.A.1994) (Crawford, J., dissenting in part and concurring in the result).

Here, the judge gave appellant and his counsel the opportunity to make an informed decision on whether to pursue any issue concerning the statutory forfeitures in this case, at trial or during the post-trial review process. Appellant and his counsel elected not to raise the issue, and appellant does not claim that his counsel was ineffective in his representation by failing to do so. *See Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (standard for ineffective assistance of counsel claims). Consequently, I conclude appellant waived the *ex post facto* issue in this case, and I join in affirming the findings and sentence.