UNITED STATES, Appellee

v.

Timothy L. ALLBERY, Airman
U.S. Air Force, Appellant.

No. 95–0255.
Crim.App. No. S28763.

U.S. Court of Appeals for
the Armed Forces.

Argued Dec. 7, 1995.

Decided July 30, 1996.

For Appellant: *Captain Harold M. Vaught* (argued); *Colonel Jay L. Cohen* and *Captain Robert E. Watson* (on brief).

For Appellee: *Major John H. Kongable* (argued); *Colonel Jeffery T. Infelise, Colonel Thomas E. Schlegel, Lieutenant Colonel Mark C. Ramsey* (USAFR) (on brief); *Lieutenant Colonel Michael J. Breslin.*

*Opinion*

EVERETT, Senior Judge:

At his contested special court-martial at Ramstein Air Base, Germany, appellant was convicted of making and uttering worthless checks by dishonorably failing to maintain sufficient funds (2 specifications), in violation of Article 134, Uniform Code of Military Justice, 10 USC § 934. The members sentenced him to a bad-conduct discharge, confinement for 2 months, and reduction to the lowest enlisted grade. The convening authority approved these results, and the Court of Criminal Appeals affirmed. 41 MJ 501 (1994). On appeal to this Court, appellant challenges the refusal of the Court of Criminal Appeals to apply dispositive precedent of this Court that rendered his conduct not criminally punishable. 42 MJ 214 (1995).

## I

Appellant wrote and uttered worthless checks to the Ramstein Enlisted Club in exchange for rolls of quarters that, then, he used to play slot machines in the club. In the Court of Criminal Appeals, appellant contended that his conduct was not criminally punishable because the checks were written in order to facilitate gambling, citing the court to *United States v. Wallace*, 15 USCMA 650, 36 CMR 148 (1966), as binding authority on point. In that case, a majority of this Court had written:

> Whether gaming is legal or illegal, transactions involving the same or designed to facilitate it are against public policy, and the courts will not lend their offices to enforcement of obligations arising therefrom.

*Id.* at 651, 36 CMR at 149. The Government responded that *Wallace* no longer was valid law because public policy had changed and that, in any event, appellant's case factually was distinguishable from that precedent.

The court quickly dismissed the Government's second argument, concluding: "[T]he Court of Military Appeals' edict in *Wallace* is so broad that we are unable to sufficiently distinguish the facts such as to justify a different result and still comply with *Wallace*." 41 MJ at 502. The court was more sympathetic to the first, however, writing:

> While we are not generally free to ignore precedent established by the Court of Military Appeals (*see United States v. Jones*, 23 MJ 301, 302 (CMA 1987)), we believe it no longer makes sense to follow *Wallace*. Therefore, unless ordered by one of our superior courts to do so, we will not.

41 MJ at 502.

The dispute continues in this Court. Appellant contends that the Court of Criminal Appeals erred both when it held itself freed of *Wallace* and when, thus unshackled, it held that appellant's conduct was criminally punishable. The Government answers: First, since *Wallace* was based upon public policy, the court below was at liberty to depart from that holding if it found, as it did, that public policy had changed; second, that public policy, indeed, had changed and that gambling no longer was seen as so opprobrious that bad checks written in connection therewith were not criminally enforceable; and, third, that *Wallace* did not apply to the facts of this case, anyway.

■ Now, we reject all of the Government's arguments and agree with appellant. Specifically, we hold that the public-policy basis of a precedent of this Court does not somehow diminish its binding effect on a case that the court below acknowledged was legally and factually indistinguishable from that precedent. Additionally, we are unconvinced that the public policy in question has changed discernibly since *Wallace* was announced, so we decline, ourselves, to overrule that decision. Finally, like the court below, we are persuaded that appellant's conduct was not distinguishable from the facts of *Wallace* in any meaningful sense.

## II

### A

■ It is trite to say that the now Court of Criminal Appeals "is not generally free to ignore our precedent. Art. 66(c), UCMJ, 10

USC § 866(c); *see Hutto v. Davis,* 454 U.S. 370, 102 S.Ct. 703, 70 L.Ed.2d 556 (1982)." *United States v. Jones,* 23 MJ 301, 302 (CMA 1987); *see also United States v. Antonelli,* 43 MJ 183, 184 (1995). Although the court below recognized this maxim, it declined to adhere to it because, in its view, "it no longer makes sense to follow *Wallace.*" 41 MJ at 502.

That court acknowledged: "Under the doctrine of *stare decisis,* courts have a *policy* of standing by precedent and not disturbing a point of settled law." 41 MJ at 502. As a *policy,* however, that court concluded that *stare decisis* did not restrict its decision when, in its view, a precedent of this Court, which was based upon public policy, no longer reflected public policy. Thus, it rationalized its departure from the generally binding effect of this Court's decisions by pointing out that *Wallace* was based upon this Court's then-view of public policy that the Court of Criminal Appeals concluded had changed in the intervening years.

The fundamental error in the court's analysis was in according the policy of *stare decisis* an aspect of flexibility that it does not have. "A precedent-making decision may be overruled by the court that made it or by a court of a higher rank." 20 AmJur2d Courts § 186 (1965). That discretion, however, does not reside in a court of a lower rank. In the absence of a superceding statute or an intervening decision of this Court or the Supreme Court of the United States, *Wallace* was absolutely binding on the Court of Criminal Appeals.

If that court believed that the underlying logic of that decision had changed in the meantime, its recourse was to express that viewpoint and to urge our reconsideration of our precedent. *Cf.* Art. 67(a)(2), UCMJ, 10 USC § 867(a)(2) (1989) (Court of Appeals for the Armed Forces shall review "all cases reviewed by a Court of Criminal Appeals which the Judge Advocate General orders sent to the Court of Appeals of the Armed Forces for review[.]"). Beyond that, however, the court was bound either to follow *Wallace* or to distinguish it. It did neither and, so, erred.

**B**

Had the Court of Criminal Appeals followed the path just mentioned, this case might well be before us on certification by the Judge Advocate General, asking this Court to reconsider *Wallace.* In such a scenario, appellant himself likely could claim the benefit of *Wallace* in any event and avoid retroactive application to him of any change, *cf. Bouie v. City of Columbia,* 378 U.S. 347, 353–54, 84 S.Ct. 1697, 1702–03, 12 L.Ed.2d 894 (1964), but it would not be inappropriate for us, in that context, to consider whether the majority opinion in *Wallace* any longer was viable. In that spirit, we have reexamined the basis of *Wallace* and now decline to depart from it.

Explaining its view of the present-day acquiescence toward gambling activity, Judge Young for the Court of Criminal Appeals wrote:

In the almost 30 years since *Wallace* was decided, the place of gambling in our society has undergone enormous change. Today, gambling, at least in some respects, is legal almost everywhere in the United States. It is not only condoned, it is organized, regulated, and largely promoted by the government as a means of raising revenue for the public coffers. The public, through referenda and statutes enacted by its representatives in legislatures, have established the acceptability of gambling as a form of entertainment and means of fund raising.

41 MJ at 502. Perhaps all that is so. Perhaps, on the other hand, it is stated a bit too broadly.

Actually, there is nothing truly modern about "the acceptability of gambling as a form of entertainment and means of fund raising." 41 MJ at 502. One author has written:

Gambling is nearly as old as civilization itself. Various games of chance existed among ancient Egyptians, Chinese, Japanese, Hebrews, Greeks, Romans, and the early Germanic tribes. Excavations in London uncovered the remnants of a 2000–year–old dice game. Perhaps more inter-

estingly, "loaded" dice were found in the Pompeii excavation. In fact, some authorities have suggested that artifacts dating from the Stone Age were used for gambling.

Governments have also been regulating gambling practically since its inception. Records from India indicate that in 321 B.C. there was a governmental department to regulate gambling, with a Superintendent of Public Games who supplied dice and collected a fee of five percent of the receipts. . . .

* * *

Gambling and the regulation of gambling also have long histories in this country. . . .

When gambling could be put to a good use, the colonists were not reluctant to employ it. For instance, early Americans often relied on lottery proceeds to finance public works.

R. Rychlak, *The Introduction of Casino Gambling: Public Policy and the Law, Symposium on Gaming in Mississippi,* 64 Miss. L.J. 291, 294–95 and 298, 299 (Winter 1995)(footnotes omitted).

At the same time, serious problems relating to gambling are long-standing, too. "In the seventeenth and eighteenth century, gambling among the British gentry was rampant"—so much so that " '[u]nless one gambled freely it was quite impossible to be counted a gentleman, or, for that matter, a lady of fashion.' " This social acceptability of gambling among the gentry, however, logically was accompanied by "large transfers of property" and the untoward attendant "disrupt[ion of] England's land-based aristocracy." 64 Miss. L.J. at 296. " '[S]ome have played first all their money, then their rings, coach and horses . . . and then, such a farm; and last, perhaps a lordship.' " *Id.* n. 34, quoting from 1 Steinmetz, *The Gaming Table: Its Votaries and Victims* 20 n. 33 (Patterson Smith Publ. Co.1969) (citation omitted).

With dukes and earls losing their estates and, with them, their noble titles at the gaming tables, Queen Anne was led to sign the Statute of Anne in 1710 in order to stabilize this chaos in British society by making large gambling debts unenforceable. 64 Miss. L.J. at 296–97. " 'The Statute of Anne was passed to protect the landed gentry from the consequences of their own folly.' " *Id.* n. 35, quoting from N. Rose, *Gambling and the Law* 73 (1986). While gambling itself remained legal, the Statute of Anne acted to curtail the large transfers of land and title that had occurred to cover gambling losses.

■ "As the New World developed, the Statute of Anne, along with other common law doctrines, became part of the law of every state in the United States." 64 Miss. L.J. n. 35. While some states legislatively have parted ways with it, the Statute of Anne still remains viable, for instance, in the historic shrine to gambling, Las Vegas, where checks written to cover gambling losses are "void ab initio" under the Statute of Anne. *Sandler v. Eighth Judicial District Court,* 96 Nev. 622, 614 P.2d 10, 11 (1980); *Sea Air Support, Inc. v. Herrmann,* 96 Nev. 574, 613 P.2d 413 (1980).

In many fora today, there is some reexamination of the wisdom of the widespread acceptability of gambling in this country that was referred to by the court below. *See, e.g.,* B. Harden and A Swardson, "Addiction: Are States Preying on the Vulnerable?," *The Washington Post,* March 4, 1996, at 1 (second of four articles on "America's Gamble"); *see also* Rychlak, Miss.L.J., *supra;* Rychlak, *Lotteries, Revenues and Social Costs: A Historical Examination of State–Sponsored Gambling,* 34 B.C. L.Rev. 11 (December 1992). This relatively recent recurrence of ambivalence seems to be fanned by the same concern that prompted the Statute of Anne almost 3 centuries ago: protection of the psychologically vulnerable from themselves.

In this context, without further comment on the social acceptability of gambling, there surely seems to be a continued public concern about its too-frequent victimization of those who are ill-equipped emotionally to handle the risks. When gaming establishments offer the convenience of check-cashing in order to facilitate on-site gambling, they

also offer the means by which a patron might lose the farm, both literally and figuratively. Where gambling is legal, the house might permissibly fleece the patron of all he brings with him, but it remains against public policy to encourage further fueling the emotional heat of the moment by "enforc[ing] obligations arising therefrom." *United States v. Wallace*, 15 USCMA at 651, 36 CMR at 149.*

### C

 At this point, it logically might be argued that we should remand this case to the Court of Criminal Appeals for reconsideration under *Wallace*. That court, however, already has held that the two are indistinguishable, and we agree.

In less than one month's time, appellant cashed 21 checks totalling $2500 at the Ramstein Enlisted Club. All of the checks were cashed in the club's "game room." During the defense case on the merits, appellant indicated that, in return for the checks, the cashier gave him "rolls of quarters," all of which he then promptly put into the slot machines in the game room. Under similar circumstances, the *Wallace* majority wrote:

> One cannot deposit a check in a slot machine. It is necessary to use coins for that purpose, rolls of which were here given the accused by the Club bartender in return for his checks, such rolls being maintained on hand for that use and the accused, in fact, so using them.

15 USCMA at 653, 36 CMR at 151.

### III

The decision of the United States Air Force Court of Criminal Appeals is reversed. The findings and sentence are set aside. The Charge is dismissed.

Chief Judge COX concurs.

---

SULLIVAN, Judge (concurring in part and dissenting in part):

Assuming the decision of this Court in *United States v. Wallace*, 15 USCMA 650, 36 CMR 148 (1966), applies to appellant's case, I agree with Senior Judge Everett's opinion in Part II A. The Court of Criminal Appeals was bound to follow our decision until we or a higher court change it or the lower court distinguishes it. *See United States v. Jones*, 23 MJ 301 (CMA 1987).

Nevertheless, I choose to read our decision in *United States v. Wallace, supra* at 651, 36 CMR at 149, narrowly. It is limited to cases where a service club knowingly and implicitly encourages a servicemember to gamble and accrue substantial financial losses. In *Wallace*, there was active participation by the management of the club up to its board of governors in the accused's gambling losses and approval of his irresponsible pay-back practices. Here, there was no showing of such cultivation or condonation which would preclude a finding that appellant's failure to pay his debts was dishonorable.

Finally, I agree with Chief Judge Quinn's dissent in *Wallace*, and I would vote to prospectively overrule even the limited construction noted above. *See Bouie v. City of Columbia*, 378 U.S. 347, 353–54, 84 S.Ct. 1697, 1702–03, 12 L.Ed.2d 894 (1964). Accordingly, I must dissent in part in this case.

---

CRAWFORD, Judge (concurring in part and dissenting in part):

As I stated in *United States v. Boyett*, 42 MJ 150, 154, *cert. denied*, —— U.S. ——, 116 S.Ct. 308, 133 L.Ed.2d 212 (1995):

> *Stare decisis* is important for stability. *Payne v. Tennessee*, 501 U.S. 808, 827, 111 S.Ct. 2597, 2609, 115 L.Ed.2d 720 (1991). The doctrine also fosters public confidence

---

* If Congress provides some unmistakable indication of a change in public policy, a different result would be called for. Certainly, there is no constitutional prohibition against enforcement of gambling debts by courts-martial.

in the judicial system and strengthens reliance upon the judicial branch of the government. *Id.* This reliance is even more important in cases involved with economic questions. *See, e.g., Swift & Co. v. Wickham,* 382 U.S. 111, 133–35, 86 S.Ct. 258, 270–71, 15 L.Ed.2d 194 (1965)(Douglas, J., dissenting); B. Cardozo, *The Nature of the Judicial Process* 149 (1921); H. Hart, *The Concept of Law* 156 (1961). The doctrine is not simply based upon nostalgia but is meant to strengthen our judicial system. Under the doctrine of *stare decisis* a decision should not be overruled without examining intervening events, reasonable expectations of servicemembers, and the risk of undermining public confidence in the law. *Florida Department of Health and Rehabilitative Services v. Florida Nursing Home Ass'n,* 450 U.S. 147, 151–55, 101 S.Ct. 1032, 1035–37, 67 L.Ed.2d 132 (1981)(Stevens, J., concurring).

But the doctrine does not apply when a statute, executive order, or other basis for a decision changes. . . .

(Footnotes omitted):

While I agree that the court below did not make the case for a change in public policy, this Court could take judicial notice that "gambling is one of the fastest growing industries in the United States" today. R. Goodman, *Legalized Gambling as a Strategy for Economic Development* 6 (1994), cited in Note, *The Promises and Perils of Legalized Gambling for Local Governments: Who Decides How to Stack the Deck?* 68 Temple L.Rev. 847 n. 1 (Summer 1995). Thus, we could decide the issue of whether there has been a change in public policy toward gambling or return the case to the court below to more fully analyze the case for a change of public policy.

In any event, because this would be the same as an *ex post facto* ruling, I agree with the result in this case. As the Supreme Court stated in *Bouie v. City of Columbia,* 378 U.S. 347, 353–54, 84 S.Ct. 1697, 1702–03, 12 L.Ed.2d 894 (1964): "If a state legislature is barred by the *Ex Post Facto* Clause from passing such a law, it must follow that a State Supreme Court is barred by the Due Process Clause from achieving precisely the same result by judicial construction."

GIERKE, Judge (concurring in the result):

I agree with the majority that the court below was not free to ignore our decision in *United States v. Wallace,* 15 USCMA 650, 36 CMR 148 (1966). I also agree that even if we overturned *Wallace,* appellant would be entitled to its protection under *Bouie v. City of Columbia,* 378 U.S. 347, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964). Accordingly, I join in reversing the decision of the Court of Criminal Appeals.

I am not prepared to join the portion of the majority opinion upholding the policy underlying *Wallace.* We need not address this issue because the court below had no choice but to follow *Wallace,* and the issue is not properly before us.