**UNITED STATES**

v.

**Captain Ronald W. CLACK, 456–31–7471, United States Air Force.**

**ACM 32681.**

U.S. Air Force Court of Criminal Appeals.

Sentence Adjudged 4 March 1997.

Decided 23 Jan. 1998.

Appellate Counsel for Appellant: Colonel Douglas H. Kohrt, Lieutenant Colonel Kim L. Sheffield, and Major Robin S. Wink.

Appellate Counsel for the United States: Colonel Brenda J. Hollis, Lieutenant Colonel Michael J. Breslin, and Captain Tony R. Roberts.

Before PEARSON, MORGAN, and SPISAK, Appellate Military Judges.

## OPINION OF THE COURT

PEARSON, Senior Judge:

On March 3, 1997, appellant, a 36–year–old single finance officer with 13 years exemplary service, pled guilty in a bench trial to fraternizing on terms of military equality with two single female enlisted members from his unit, one as a sexual partner and the other as a friend; and engaging in conduct unbecoming an officer by making sexually suggestive gestures and comments at several parties attended by enlisted personnel from his unit. The judge sentenced him to a dismissal, 6 months confinement (the prosecutor only argued for 4), a $5,000 fine (which the prosecutor didn't ask for), and a reprimand. To comply with a pretrial plea agreement, the convening authority cut the confinement to 90 days, but otherwise approved the adjudged sentence.

Appellant argues his dismissal and fine are too severe for the offenses and urges us to consider recent cases "where the Air Force handled allegations of fraternization by Air Force officers with dispositions falling far short of a punitive discharge from the service." Additionally, appellant argues that he was subject to *ex post facto* forfeiture of pay by recent changes to Articles 57 and 58b, Uniform Code of Military Justice (UCMJ), 10 United States Code (U.S.C.) §§ 857, 858b. We grant relief.

## FACTS

In January 1994, appellant arrived at Travis Air Force Base, California, as the budget officer in the Comptroller Division. The Division consisted of 5 officers, 44 enlisted members, and 20 civilians divided into three main sections: Budget, Finance, and Accounting.

In the summer, he attended an off-base house warming party for two enlisted females from the Finance section, Senior Airmen CN and SW. The two women had

invited all the Comptroller personnel to the party, but appellant was the only officer who attended, along with about 20 enlisted and civilian unit members. Airman CN videotaped much of the party. At one point, appellant bent over with his clothed buttocks to the camera and several times wagged his tongue in a manner "suggestive of cunnilingus." Airman CN responded at one point by calling appellant "Big Daddy" and asking him to do it again, which he did, in front of some party-goers.

Not long after the party, Airman SW called appellant at his off-base house and asked if she could visit him to discuss a personal problem. Appellant agreed. However, their "discussion" turned physical as the two engaged in fellatio, cunnilingus, and intercourse. Two weeks later, they met again at his home and engaged in intercourse; after which, they agreed to stop their relationship at appellant's urging. They never discussed the relationship again, and according to SW appellant showed no special treatment toward her.

Besides socializing with Airmen CN and SW, he called them "Bubbles" and "Trixie," respectively, at an October military softball tournament where they served as "cheerleaders" for the Comptroller Division team. Following a third place tournament finish, appellant hosted a team victory party at his house. Fifteen Division personnel attended and, after the party broke up, a male staff sergeant and Airman CN spent the night at appellant's house with CN sleeping in a guest room.

On Thanksgiving, appellant invited Airman CN and three other Comptroller enlisted personnel to his home for dinner. Once again, the event was videotaped and appellant characteristically "wagged his tongue" at the camera several times. He also made a few references to oral sex, including "I don't want to burn my tongue because you never know when you might need it."

In January 1995, appellant was promoted to comptroller, taking overall supervision of the Division. Six months later, the Division reorganized as the 60th Comptroller Squadron with appellant as the commander. Before taking command, appellant went to the squadron chaplain for advice on whether to accept the promotion in light of his indiscretions the year before. The chaplain urged him to accept the position and put the past behind him, which he did.

By July 1995, rumors were circulating within the squadron that appellant was having an affair with Airman CN. Strangely enough, CN had started the rumors and they were false—at most appellant and CN had been friends. However, the rumors evidently persisted as Air Force criminal investigators ultimately began an investigation of appellant's conduct. When confronted with allegations about his affair with Airman SW and his conduct at the various parties, he immediately confessed. On May 23, 1996, he was relieved of his command, and the wing commander took action to halt appellant's upcoming promotion to major.

On September 28, 1996, the general court-martial convening authority referred appellant's case to trial. On October 1, appellant submitted a request to resign in lieu of court-martial (RILO) which the Secretary of the Air Force rejected on January 6, 1997.

## SENTENCE APPROPRIATENESS

In seeking sentence relief, appellate defense counsel questions whether this case would have even made it to trial today. Without submitting any concrete evidence, counsel claims that the Secretary of the Air Force has been approving officer RILOs at a much higher rate than in the past (61% in 1997 versus 18% 1996). Absent any evidence submitted by motion to back up that claim, we give it no weight.

Recent official documents do, however, lend some support to counsel's claim. For example, on July 16, 1997, the Secretary of the Air Force and the Chief of Staff issued a memorandum on "Fraternization and Unprofessional Relationships" which encouraged commanders to "draw on a wide range of responses, ranging from counseling individuals, to admonition and reprimand, nonjudicial punishment under Article 15, UCMJ, administrative separation, and, in the most aggravated cases, court-martial." The memorandum went on to advise commanders that

"[n]ot every case warrants severe action; some can be corrected with minimal timely action." Letter from Secretary Sheila E. Widnall and General Ronald R. Fogleman to Commanders, *Update—Fraternization and Unprofessional Relationships* (July 16, 1997). In the same vein, we are aware of several recent highly-publicized cases where the Secretary approved RILOs, with general discharge characterizations, for officers who had engaged in sexual relationships with enlisted members.

■■■ In any event, this is not a case for discretionary sentence comparison at the appellate level. Normally, military appellate courts and convening authorities cannot consider the punishments in other cases in determining an appropriate sentence for an accused. An exception exists when cases arise within the same jurisdiction that are closely related or connected, that is a direct correlation exists between each accused and their respective offenses; the punishments are "highly disparate;" and good and cogent reasons do not exist for the disparity. *See, e.g., United States v. Simoy,* 46 M.J. 592, 618 (A.F.Ct.Crim.App.1996); *United States v. Commander,* 39 M.J. 972 (A.F.C.M.R.), *pet. denied,* 40 M.J. 283 (C.M.A.1994). Appellate defense counsel offer no firm cases for comparison here other than their vague references to other "dispositions" short of trial.

■■■ Instead, we focus on whether appellant's sentence is appropriate based on the individual circumstances of the case, giving due regard to both the offenses and the offender. *United States v. Snelling,* 14 M.J. 267, 268 (C.M.A.1982). The only aggravating factor is that appellant fraternized with members of his own unit, culminating in a sexual relationship with one of them. On the other hand, several mitigating factors exist: the fraternization with the single females occurred when appellant, who was also single, did not supervise them and they belonged to different sections in the unit; appellant confessed when confronted rather than try to lie his way out; and these purely military offenses were rather stale (over 2 years old by the time of trial).

Additionally, we are impressed with appellant's record. According to the evidence pre-sented, he was unquestionably an outstanding comptroller and commander who led his people to new heights of achievement, garnering several awards in the process. He was a compassionate leader who genuinely cared about his subordinates, supported them, and sought recognition for them when others in his shoes had not. As one 10-year civilian veteran of the Division observed, "He would walk through the squadron, and would know everyone, everyone's children, who had a cold, etc." Defense Exhibit AD.

Moreover, appellant changed his entire approach toward his off-duty activities when he took over the Division. As one subordinate remarked in a sentencing exhibit:

> when he became the Comptroller and then the Squadron Commander, there was a subtle transition in his demeanor. He had always been professional, but his private life was unknown to us. It was as though he felt a need to project a particular image once he became the Comptroller, and the Commander.

Defense Exhibit AF. In other words, he tried to right the wrong.

Balancing all of these factors against the approved sentence which included hefty jail time for this offense, we conclude that a dismissal and fine are inappropriately severe penalties in this case.

### Ex Post Facto

Appellant's *ex post facto* arguments were resolved by the United States Court of Appeals for the Armed Forces in *United States v. Gorski,* 47 M.J. 370 (1997). We intend to apply that decision despite appellate government counsel's argument that we should ignore our superior Court's opinion and adhere to our decision in *United States v. Pedrazoli,* 45 M.J. 567 (A.F.Ct.Crim.App.1997), which *Gorski* essentially reversed. *See United States v. Plumb,* 47 M.J. 771 (A.F.Ct.Crim. App.1997).

The government argues that our superior court's precedent is "inchoate," that is not binding upon us until the case in which it is announced becomes final in law. *See* Article 71(c), UCMJ, 10 U.S.C. § 871(c). For example, if the government asks the United States

Supreme Court to grant *certiorari* in the case, and the Court does, we are at liberty to ignore our superior court for one or more years while the case stays on appeal. Adopting that proposition would inject chaos into an already unwieldy legal system. Trial judges and advocates, who in the end must apply the never ending stream of judicial precedent, would need a matrix system of charts to track the moment-by-moment status of every appellate opinion within their jurisdiction to know what "precedent" to follow even though many "appeals" drag on for years.

Moreover, adopting such a proposition would hinder, rather than promote, respect between the various appellate levels if those below could routinely ignore those above because the "case was not final." **We need not discuss esoteric concepts of "inchoateness" to get to the bottom line here: We expect Air Force trial judges to follow our legal precedent when announced, just as the Court of Appeals for the Armed Forces expect us to follow theirs.**

Accordingly, we hold that collection of any forfeitures pursuant to 10 U.S.C. §§ 857 and 858b were illegal and will be restored. The record of trial is returned to The Judge Advocate General for appropriate action. The case need not be returned to this Court following administrative correction unless further appellate review is required.

## CONCLUSION

We approve only so much of the sentence as provides for 90 days confinement and a reprimand. The findings and sentence, as modified, are correct in law and fact and are

AFFIRMED.

Judges MORGAN and SPISAK concur.